1  COTCHETT, PITRE & MCCARTHY LLP
   Joseph W. Cotchett (36324)
2  jcotchett@cpmlegal.com
   Mark C. Molumphy (168009)
3  mmolumphy@cpmlegal.com
   Nancy L. Fineman (124870)
4  nfineman@cpmlegal.com
   840 Malcolm Road, Suite 200
5  Burlingame, California 94010
   Tel:  (650) 697-6000
6  Fax: (650) 697-0577

7  BOTTINI & BOTTINI, INC.
   Francis A. Bottini, Jr. (175783)
8  fbottini@bottinilaw.com
   Albert Y. Chang (296065)
9  achang@bottinilaw.com
   Yury A. Kolesnikov (271173)
10 ykolesnikov@bottinilaw.com
   7817 Ivanhoe Avenue, Suite 102
11 La Jolla, California  92037
   Tel:  (858) 914-2001
12 Fax: (858) 914-2002

13 *Attorneys for Plaintiff Mary Tolaro*

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                   SOUTHERN DIVISION

17 | MARY TOLARO, individually and derivatively on behalf of ALLERGAN, INC. | ) | Case No. |
18 | | ) | **VERIFIED SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT FOR:** |
19 | Plaintiff, | ) | |
   | vs. | ) | |
20 | | ) | |
21 | DEBORAH DUNSIRE, MICHAEL R. GALLAGHER, TREVOR M. JONES, LOUIS J. LAVIGNE, JR., PETER J. McDONNELL, KARAH H. PARSCHAUER, TIMOTHY D. PROCTOR, DAVID E.I. PYOTT, RUSSELL T. RAY, and HENRI A. TERMEER, | ) | **1. BREACH OF FIDUCIARY DUTY; and** |
22 | | ) | **2. BREACH OF DUTY OF HONEST SERVICES** |
23 | | ) | |
24 | Defendants, | ) | **JURY TRIAL DEMAND** |
25 | vs. | ) | |
26 | ALLERGAN, INC., a Delaware corporation, | ) | |
27 | Nominal Defendant. | ) | |
28 | | ) | |

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

Page

I. OVERVIEW OF THE ACTION ...................................................................... 1

II. JURISDICTION AND VENUE .................................................................... 10

III. THE PARTIES ............................................................................................ 11

    A. Plaintiff ............................................................................................ 11

    B. Nominal Defendant Allergan, Inc. .................................................. 11

    C. Individual Defendants ...................................................................... 11

IV. FIDUCIARY DUTIES OF THE INDIVIDUAL
DEFENDANTS ........................................................................................... 14

V. CLASS ACTION ALLEGATIONS ............................................................ 16

VI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ................... 17

VII. SUBSTANTIVE ALLEGATIONS ............................................................. 24

    A. Allergan's Shareholders Vote in Favor of a Special
Meeting Right, But Allergan's Board Adopts Bylaw
Amendments to Undercut that Right ................................................ 25

    B. The Special Meeting Bylaw Is Inconsistent With the
Certificate of Incorporation. ........................................................... 27

    C. The Special Meeting Bylaw Adds New Conditions to the
Certificate Rights That Are Not Contained in the
Certificate of Incorporation. ........................................................... 30

    D. The Special Meeting Bylaw Contains Burdensome
Disclosure Requirements. ................................................................ 31

    E. Defendants Refuse to Consider in Good Faith Offers
from Valeant, Refuse to Inform Themselves Concerning
Offers from Valeant, and Take Steps to Entrench
Themselves ....................................................................................... 33

    F. Two Allergan High-Level Executives Resign Amid The
Individual Defendants' Wrongful Conduct ..................................... 42

    G. The Individual Defendants Attempt to Thwart the Special
Meeting Called by Allergan's Shareholders .................................... 45

i

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

H.    Prior to the Time That the Individual Defendants Were Forced by Valeant's Delaware Litigation to Allow Valeant to Call a Special Meeting of Allergan's Shareholders, Shareholder Advisory Firms ISS and Glass Lewis Decried Allergan's Special Meeting Bylaw As Onerous, Unnecessary, and Contrary to Shareholder Rights ................................................................. 47

I.    Rebuked by the Delaware Court in Their Efforts to Block a Special Meeting, the Individual Defendants Continue to Take Actions to Prevent a Special Meeting Which Has the Potential to Recall Them From Office ........................... 49

J.    The Individual Defendants Cause Allergan to File a Lawsuit in California to Delay the Special Meeting ......................... 53

VIII.   DEFENDANT PARSCHAUER'S WRONGDOING ................................... 55

IX.    CAUSES OF ACTION ...................................................................... 57

Breach of Fiduciary Duties
(Direct Claim on Behalf of Plaintiff and the Class And Against All Individual Defendants) ..................................... 57

Breach Of Duty Of Honest Services
(Derivative Claim on Behalf of Allergan and Against Defendants Pyott and Parschauer) ...................................... 59

Breach of Fiduciary Duties
(Derivative Claim on Behalf of Allergan and Against All Individual Defendants) ......................................................... 59

X.    PRAYER FOR RELIEF ..................................................................... 60

XI.    JURY DEMAND ............................................................................. 61

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12

"This obstructive process echoes a trend of recalcitrant adherence to progressive corporate governance standards at Allergan, including a period marked by active opposition to shareholder proposals covering the right to act by written consent and the separation of the roles of chairman and CEO – proposals that received the affirmative vote of 50.1% and 50.5% of votes cast at Allergan's 2013 and 2014 special meetings, respectively. . . Further to these concerns, we again draw attention to the board's expeditious adoption of a restrictive poison pill just one day after Valeant and Pershing Square disclosed their joint ownership position. . . *[W]e consider these efforts generally more indicative of a board concerned with entrenching its position than seeking to enhance shareholder value.*"

13
14

Glass Lewis & Co. report, August 4, 2014

## I.   <u>OVERVIEW OF THE ACTION</u>

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.     This is a shareholder derivative action brought by a shareholder of nominal party Allergan, Inc. ("Allergan" or the "Company") on behalf of the Company, and a shareholder class action brought by plaintiff on behalf of the holders of Allergan common stock based on defendants' wrongdoing with respect to a proposed acquisition of Allergan worth up to $59 billion to Allergan shareholders.  The action is brought against the members of the Company's Board of Directors ("Board") and the Company's Vice President and Assistant General Counsel arising out of defendants' breaches of fiduciary duties and candor related to their rejection of and failure to properly consider the buyout offer for Allergan by Valeant Pharmaceuticals International, Inc. and Pershing Square (collectively "Valeant") at a significant premium, and for defendants' illegal breaches of fiduciary duties in attempting to entrench themselves at the Company, both of which are actions that are harmful and unfair to Allergan and its public shareholders and have caused significant damage to the Company and its shareholders.

1

2.     This action is unrelated to the shareholder derivative action, *Rosenbloom v. Pyott*, Case No. 8:10-cv-1352-DOC-MLG, brought in 2010, alleging that the Board knowingly allowed Allergan to promote the illegal off-label use of Botox, a cosmetic and therapeutic drug, by which Allergan settled several *qui tam* suits and pled guilty in a criminal case.

3.     Plaintiff's allegations are based upon personal knowledge with respect to herself and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, analyst reports and SEC filings, reports issued by Glass Lewis & Co. and ISS, review of the pleadings and evidence in the lawsuits referenced herein between Allergan and Valeant, and investigations undertaken by her counsel, as to all other allegations.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

4.     In early 2014, when Allergan's stock was trading at approximately $123 per share, Valeant Pharmaceuticals contacted Allergan and indicated an interest in submitting an acquisition proposal.  Rather than discussing the overture in good faith, the Allergan board, let by Defendant Pyott, immediately adopted, within hours, a poison pill.

5.     In February 2014, Valeant and Pershing Square, an investor based in New York, began discussing how they could work together in connection with a possible merger between Valeant and Allergan.  On February 25, 2014, they entered into a letter agreement setting forth the terms of their relationship with respect to Allergan.  That same day, PS Fund 1, LLC, an entity formed by Pershing Square, began purchasing Allergan stock.

6.     On April 21, 2014, Valeant and Pershing Square announced that PS Fund 1, LLC was the beneficial owner of 9.7% of Allergan's outstanding stock.  They simultaneously announced a proposal by which Valeant would acquire Allergan for a mixture of cash and Valeant stock, representing a substantial premium over the pre-announcement share price.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

7.    Allergan's Board of Directors consulted with its legal and financial advisors about what the Board was required to do to fulfill its fiduciary duties to Allergan's shareholders.    Allergan's investment banker, Goldman Sachs, reportedly advised Allergan's Board that it should request more information from Valeant in order to fully inform itself regarding Valeant's indication of interest.    However, Allergan's Board ignored Goldman Sachs' advice and instead embarked on a course of conduct designed solely to entrench the individual board members in office and to deter an acquisition by Valeant at all costs, and regardless of the premium offered by Valeant.    Indeed, such conduct is not protected by the business judgment rule because Allergan's Board not only acted in a self-interested fashion, but completely failed to inform itself regarding Valeant's offer.    The business judgment rule is inapplicable to board members who fail to inform themselves of all material information.

8.    In addition to ignoring Goldman Sachs' advice, Allergan's Board adopted and defended bylaw provisions that were unlawful and not in the best interests of the Company's shareholders.    The Board was aided and abetted in its wrongdoing regarding the bylaws by Defendant Parschauer, the Company's Vice President and Assistant General Counsel.    Parschauer used to be employed as an attorney at Latham & Watkins, Allergan's lead outside law firm.    Parschauer worked directly with Allergan's Board and with Latham & Watkins to devise, implement, and defend the bylaws, notwithstanding knowledge that the bylaws were unlawful and/or unfair to Allergan's shareholders.    In doing so, Parschauer and the other Individual Defendants named herein subjected Allergan to millions of dollars in legal fees from Latham & Watkins which could and should have been avoided had the Individual Defendants complied with their corporate fiduciary duties.

9.    On May 12, 2014, Allergan sent Valeant a letter stating that Allergan's board had rejected the merger proposal.    Allergan later issued a press release and investor presentation setting forth the board's purported reasons for rejecting a transaction, but Allergan refused to negotiate with Valeant.

3

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

10.     On <u>May 30, 2014</u>, in a letter to Allergan's CEO David Pyott, Valeant made a revised merger proposal that offered the following terms, among others: $72.00 per share; 0.83 common shares of Valeant stock; and a Contingent Value Right worth up to $25.00 per Share.  As part of the May 30, 2014 revised proposal, Pershing Square agreed to forego all cash and accept 100% of its consideration in Valeant stock using an exchange ratio determined based on the previous day's closing prices of Allergan and Valeant stock.  Pershing Square would also receive $20.75 per share less consideration than other Allergan stockholders, providing approximately $600 million more value for other Allergan stockholders.

11.     Under this proposal, Allergan's shareholders would receive consideration in cash and Valeant shares with a combined value that, as of the date of the offer, reflected a 55 percent (or $19 billion) premium above the market value of Allergan stock prior to Valeant and Pershing Square announcing they were interested in a transaction.

12.     Once again, Allergan's board rejected the offer outright, refusing to negotiate and declining to meet with Valeant to learn more about its business, notwithstanding that it claimed to be rejecting the offer because of supposed concerns about Valeant's business.

13.     Glass Lewis, a leading independent shareholder advisory firm, has issued a report in which it states that Allergan is engaging in "obstructive" behavior "more indicative of a board concerned with entrenching its position than seeking to enhance shareholder value."

14.     The entrenchment motive by Defendant Pyott and the other Individual Defendants is supported by abundant evidence.  At a prior deposition taken on October 10, 2014 in the matter pending in this Court where Allergan is the plaintiff,[1] Pyott testified that he has been awarded in excess of $10 million per year in total compensation by Allergan in each of the last five years, and that he holds Allergan

---

[1] *Allergan, Inc. et al. v. Valeant Pharmaceuticals International, Inc. et al.*, Case No. SACV 14-1214-DOC(ANx) (C.D. Cal.) (the "California Lawsuit").

4

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  options worth $350 million.   Indeed, in the years 2011, 2012 and 2013, Allergan paid
2  Pyott an average of $15.7 million annually.

3        15.    Valeant and Pershing Square eventually acquired a 9.7% stake in Allergan.
4  They then solicited proxies from additional shareholders, constituting in the aggregate
5  over 30% of Allergan's shareholders, and requested, as the Company's bylaws and
6  articles of incorporation allow, that Allergan hold a special meeting of shareholders.[2]
7  However, Allergan rebuffed Valeant's requests and took actions to interfere with
8  Valeant's right to call a special meeting to allow shareholders to vote on matters of
9  material importance, including a non-binding vote requesting Allergan to enter into
10  merger discussions with Valeant/Pershing and a vote to replace six incumbent Allergan
11  directors with directors nominated by Valeant/Pershing.

12        16.    When news of Valeant's offer was made public, Allergan's stock
13  skyrocketed, and currently trades at approximately $194 per share.

14        17.    Valeant has stated that it is willing to pay up to $200 per share for Allergan
15  stock – a price that would value Allergan at $59 billion.

16        18.    Allergan's current Board (the Individual Defendants named herein) was
17  eventually sued by Valeant and Pershing Square in Delaware Chancery Court in August
18  2014 for breach of fiduciary duty, seeking declaratory and injunctive relief.[3]  Chancellor
19  Bouchard granted Valeant's motion to expedite the proceedings at a hearing held on
20  September 22, 2014.   After reviewing the parties' briefs and evidence, Chancellor
21  Bouchard colorfully described Allergan's bylaws as "horse chokers" and made other
22  comments that signaled to the parties that he viewed Valeant and Pershing's claims as
23  having merit and that he was inclined to fashion injunctive relief in Valeant/Pershing's
24  favor.   As a result of the Chancellor's comments at the September 2014 hearing,
25  ***Allergan's Board was forced to agree to a stipulated order in the Delaware action,***

26  
27  [2] The proxies and request to hold a special meeting were submitted by PS Fund 1, LLC, a fund controlled by Pershing Square.
28  [3] *PS Fund 1 LLC et al. v. Allergan, Inc. et al.*, C.A. No. 10057-CB (Del. Ch. 2014).

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  *entered September 16, 2014, requiring Allergan to hold the special meeting on*
2  *December 18, 2014*.

3       19.    The September 16, 2014 stipulated order in Delaware precludes Allergan
4  from taking any action to "delay, postpone, or not hold the Special Meeting on
5  December 18, 2014, or to seek to invalidate any Requests."

6       20.    Faced with a rebuke by Chancellor Bouchard concerning their adoption and
7  implementation of the bylaws, the Individual Defendants caused Allergan to file an
8  action in this Court to seek a different outcome for their fight with Valeant/Pershing.
9  Allergan sought expedited proceedings from Judge David O. Carter, who denied such
10  application by order dated August 7, 2014.  Then, less than three weeks after it was
11  forced to enter into the September 16, 2014 stipulated order in Delaware, Allergan filed
12  a motion for preliminary injunction in this Court on October 6, 2014, seeking an
13  injunction barring Valeant and Pershing from voting their Allergan stock in favor of the
14  proposals submitted for shareholder consideration at the December 18, 2014 special
15  meeting.  Having lost in their bid to enforce the unlawful bylaws in Delaware, the
16  Individual Defendants caused Allergan to waste millions more on legal fees in an effort
17  to attempt to make Valeant's victory in Delaware a Pyrrhic victory.

18       21.    After engaging in extensive expedited discovery relating to the motion for
19  a preliminary injunction, Judge Carter held a hearing on the motion on October 28, 2014
20  and thereafter took the matter under submission.  *Then, on November 4, 2014, Judge*
21  *Carter issued a ruling denying in substantial part Allergan's motion for preliminary*
22  *injunction*, stating:

23            "It is in situations like these that courts should be mindful that
24            Congress designed the Williams Act to be neutral and to leave
25            decisions regarding a company's future and a company's
26            management in the hands of shareholders, so long as shareholders
27
28

have adequate information to make those decisions."[4]

22.     The Individual Defendants have breached their duty of candor by making false and misleading statements to Allergan's shareholders regarding Valeant's offer and regarding other material aspects of matters that will submitted for the shareholders' vote at the December 18, 2014 special meeting. Allergan's Board, as more fully described herein, has also engaged in conduct which constitutes a breach of the Board's fiduciary duties and constitutes self-dealing.

23.     Among other things, circumstantial evidence exists suggesting that the Individual Defendants have caused Allergan to suddenly and materially increase Allergan's financial guidance to the market in order to attempt to make Allergan's finances look better.[5]  In February 2014, before Valeant made its offer, Allergan issued earnings guidance to the stock market which predicted earnings growth between 12% and 15% for fiscal year 2014. On May 12, 2014, Allergan suddenly changed its guidance and told analysts that Allergan "can achieve EPS growth of 20% on a compound annual basis over the next five years." Allergan then increased its guidance again July 14, 2014. Analysts have observed that there do not appear to have been any changes in Allergan's business during this period that would account for such a material change in Allergan's earnings guidance.

24.     The absence of any fundamental changes in Allergan's business suggests that the Individual Defendants may have told management to increase Allergan's earnings guidance as part of defendants' efforts to thwart Valeant's offer at any cost. Increased earnings guidance obviously makes Allergan look more valuable and thus

---

[4] Judge Carter did grant the motion in part, requiring Valeant and Pershing Square to disclose additional facts regarding their offer for Allergan.  But Judge Carter denied the most important relief sought by Allergan – a preliminary injunction barring Valeant and Pershing Square from voting their Allergan shares in favor of the proposals submitted for shareholder consideration at the December 18, 2014 special meeting.

[5] Valeant cited to this evidence in opposition to Allergan's motion for preliminary injunction in this Court.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  makes Valeant's offer look less valuable.  The person at Allergan in charge of earnings

2  guidance was, at the time, Jeff Edwards, the Company's CFO.  Edwards enjoyed this

3  prestigious position and was well-paid for his services, having earned $2,961,943 in

4  2013.

5      25.    Allergan unexpectedly announced Edward's resignation on August 18,

6  2014, right in the middle of the year and right in the middle of Valeant's pursuit of

7  Allergan.  Allergan initially provided very few details about Edward's resignation, and

8  then later offered as an explanation that Edwards "wanted to spend more time with his

9  family."

10      26.    Then, on November 3, 2014, Allergan announced that the head of its M&A

11  department, David Lawrence, had also resigned to "spend more time with his family."

12  Evidence suggests that Lawrence was pressured to resign as a result of clashing with

13  Defendant Pyott over Pyott's smear campaign against Valeant, as described below.

14      27.    At the same time the Individual Defendants were causing Allergan to

15  quickly and unusually increase its earnings guidance to Wall Street, Defendant Pyott was

16  spearheading a campaign to discredit Valeant and drive down its stock price.  In July

17  2014, representatives of Allergan, including its CEO and Chairman, Defendant Pyott,

18  commenced a highly unusual road show, traveling to Canada to meet with *Valeant's*

19  shareholders. Allergan had never before met with Valeant's shareholders, and the

20  meetings had no discernible purpose other than to injure Valeant and depress its share

21  price in order to attempt to make Valeant's acquisition proposal look less favorable.

22  During its meetings with Valeant shareholders, Allergan disparaged Valeant and its offer

23  to acquire Allergan in an effort to depress Valeant's stock and to garner opposition to

24  Valeant's offer.

25      28.    Due to this and other unlawful conduct, Valeant and Pershing Square filed

26  a counterclaim against Allergan in this Court on August 19, 2014.  The counterclaim

27  poses the risk of additional substantial damages to Allergan.  In its counterclaim,

28  Valeant/Pershing alleges that Allergan's tactic of seeking to ward off an acquisition

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

proposal by soliciting opposition to the proposal from the acquirer's shareholders without filing a proxy statement violates the federal securities laws.

29.     The Individual Defendants' conduct has caused some large Allergan shareholders who are not known as activists to rebuke the Individual Defendants.  At his deposition on October 10, 2014 in *Allergan, Inc. et al. v. Valeant Pharmaceuticals International, Inc. et al.*, Case No. SACV 14-1214-DOC(ANx) (C.D. Cal.), Defendant Pyott <u>admitted</u> to having received a letter from T. Rowe Price stating its displeasure with the Company's tactics and stating that T. Rowe Price does not believe that it is in Allergan's interests to attempt to discredit Valeant.

30.     Defendant Pyott allegedly personally participated in preparing, reviewing, and approving a "Valeant is Vile" presentation deck as part of Allergan's effort to discredit Valeant and cause a reduction in Valeant's stock price.  Pyott has attempted to defend his actions and those of the other Individual Defendants by stating that his efforts were allegedly necessary to comply with his fiduciary duties, since the Board had received an offer from Valeant which entailed Valeant stock as partial consideration. But conducting due diligence on the value of an acquirer's stock is vastly different than traveling to Canada to conduct a smear campaign whose aim was to effectuate a reduction in Valeant's stock price.

31.     Valeant has claimed that this highly unusual attempt to convince another company's shareholders to sell their stock was unlawful.  On June 24, 2014, prior to Allergan's roadshow in Canada, Valeant had filed a Preliminary Proxy Statement on Schedule 14A with the SEC seeking shareholder approval for the issuance of shares in connection with Valeant's bid to acquire or merge with Allergan.  This solicitation is ongoing.  Thus, at the time of the roadshow, Valeant shareholders were subject to an ongoing proxy solicitation with respect to a potential transaction with Allergan. Allergan's criticisms of Valeant directly to Valeant shareholders were, according to Valeant's pending counterclaims in *Allergan, Inc. et al. v. Valeant Pharmaceuticals International, Inc. et al.*, Case No. SACV 14-1214-DOC(ANx) (C.D. Cal.), an attempt

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  to solicit them not to support the share issuance.

2      32.    Under Rule 14a-3 of the Exchange Act, "no solicitation subject to this

3  regulation shall be made unless each person solicited is concurrently furnished or has

4  previously been furnished with" a publicly-filed preliminary or definitive proxy

5  statement in the form and manner prescribed by the SEC. Allergan did not file a proxy

6  statement (or any disclosure whatsoever) in connection with its solicitation of Valeant

7  shareholders, which according to Valeant constitutes a violation of Rule 14a-3. Nor did

8  Allergan allegedly take the steps required under Rule 14a-12 in respect of solicitations

9  made prior to filing a proxy statement.

10      33.    Valeant has also alleged that Allergan's violation of Rule 14a-3 was

11  intentional. Its improper solicitation was carried out by its Chairman and CEO, as part

12  of the extensive campaign described herein to manipulate Valeant's stock price in an

13  attempt to reduce the consideration being offered to Allergan's shareholders and make

14  Valeant's proposal appear less desirable. This wrongful conduct has subjected Allergan

15  and the Individual Defendants to potential substantial liability under the federal

16  securities laws. This conduct constituted self-dealing because the Individual

17  Defendants' conduct was taken with the goal of protecting their lucrative jobs and

18  blocking Valeant's offer at all costs.

19  **II.    JURISDICTION AND VENUE**

20      34.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331

21  and 1332(a)(2) in that this action presents a federal question and the plaintiff and

22  defendants are citizens of different states and the amount in controversy exceeds the sum

23  or value of $75,000, exclusive of interest and costs. This action is not a collusive action

24  designed to confer jurisdiction on a court of the United States that it would not otherwise

25  have.

26      35.    This Court has jurisdiction over each defendant named herein because each

27  defendant is either a corporation that conducts business in and maintains operations in

28  this District, or is an individual who has sufficient minimum contacts with this judicial

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

district so as to render the exercise of jurisdiction by the district courts of this District permissible under traditional notions of fair play and substantial justice.

36.   Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts complained of herein occurred in this District and Allergan, Inc.'s principal executive offices are located at 2525 Dupont Drive, Irvine, California 92612, where the day-to-day operations of the Company are directed and managed.

### III.   THE PARTIES

#### A.   Plaintiff

37.   Plaintiff Mary Tolaro is a current shareholder of Allergan, Inc., was a shareholder of Allergan, Inc. at the time of the transactions and events complained of herein, and has continuously held Allergan stock since at least 1997.  Plaintiff is a citizen of Ohio.

#### B.   Nominal Defendant Allergan, Inc.

38.   Nominal Defendant Allergan, Inc. is a Delaware corporation with its principal executive offices located at 2525 Dupont Drive, Irvine, California 92612.

#### C.   Individual Defendants

39.   Defendant Deborah Dunsire ("Dunsire") has served as an Allergan director since December 2006.  Ms. Dunsire, at all relevant times, participated in the operation and management of Allergan and its related subsidiaries, and conducted and culpably participated, directly and indirectly, in the conduct of Allergan's business affairs. Allergan paid Dunsire $390,349 in 2013.  Dunsire is a resident of Massachusetts.

40.   Defendant Michael R. Gallagher ("Gallagher") has served as an Allergan director since 1998.  Gallagher is Allergan's Lead Independent Director.  At the 2014 meeting of the Company's shareholders, 33.4% of the Company's shareholders voted against re-electing Gallagher.  Allergan paid Gallagher $424,355 in 2013.  Gallagher is a resident of California.

11

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

41.     Defendant Trevor M. Jones ("Jones") has served as an Allergan director since 2005.  Jones, at all relevant times, participated in the operation and management of Allergan and its related subsidiaries, and conducted and culpably participated, directly and indirectly, in the conduct of Allergan's business affairs.   Allergan paid Jones $451,021 in 2013.  Jones is a resident of Reigate, Surrey, United Kingdom.

42.     Defendant Louis J. Lavigne, Jr. ("Lavigne") has served as an Allergan director since 2005.  Lavigne, at all relevant times, participated in the operation and management of Allergan and its related subsidiaries, and conducted and culpably participated, directly and indirectly, in the conduct of Allergan's business affairs.  Allergan paid Lavigne $450,732 in 2013. Lavigne is a resident of California.

43.     Defendant Peter J. McDonnell ("McDonnell") has served as an Allergan director since 2013.  McDonnell, at all relevant times, participated in the operation and management of Allergan and its related subsidiaries, and conducted and culpably participated, directly and indirectly, in the conduct of Allergan's business affairs.  On information and belief, McDonnell is a resident of California.

44.     Defendant Karah H. Parschauer ("Parschauer") is, and has been at all relevant times, Vice President and Assistant General Counsel at Allergan, Inc.  As an officer and employee of Allergan, Parschauer owed fiduciary duties of good faith, care, and loyalty to Allergan.  Parschauer also owed a duty of honest services to her employer, Allergan.  Parschauer breached those duties as detailed herein.  On information and belief, Parschauer is a resident of California.

45.     Defendant Timothy D. Proctor ("Proctor") has served as an Allergan director since 2013.  Proctor, at all relevant times, participated in the operation and management of Allergan and its related subsidiaries, and conducted and culpably participated, directly and indirectly, in the conduct of Allergan's business affairs.  Allergan paid Proctor $429,232 in 2013.  Proctor is a resident of North Carolina.

46.     Defendant David E.I. Pyott ("Pyott") has served as Allergan's Chairman of the Board of Directors since 2001 and as the Company's Chief Executive Officer of

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  Allergan ("CEO") since January 1998.  Pyott also served as President of Allergan from

2  January 1998 until February 2006.  Pyott at all relevant times participated in the

3  operation and management of Allergan and its related subsidiaries, and conducted and

4  culpably participated, directly and indirectly, in the conduct of Allergan's business

5  affairs.  In the years 2011, 2012 and 2013, Allergan paid Pyott an average of $15.7

6  million annually.  In 2012, Allergan granted Pyott 165,000 restricted stock units merely

7  to "recognize over a decade of outstanding performance."  In the first quarter of 2014,

8  Pyott sold 252,000 shares of Allergan stock at $123.12, more than $50 per share below

9  the current implied price of the Exchange Offer.  These shares were not sold pursuant to

10  a 10b5-1 plan.  Pyott is a resident of California.

11     47.   Defendant Russell T. Ray ("Ray") has served as an Allergan director since

12  2003.  Ray, at all relevant times, participated in the operation and management of

13  Allergan and its related subsidiaries, and conducted and culpably participated, directly

14  and indirectly, in the conduct of Allergan's business affairs.  Allergan paid Ray

15  $473,372 in 2013. Ray is a resident of Massachusetts.

16     48.   Defendant Henri A. Termeer ("Termeer") has served as an Allergan director

17  since January 24, 2014. Termeer, at all relevant times, participated in the operation and

18  management of Allergan and its related subsidiaries, and conducted and culpably

19  participated, directly and indirectly, in the conduct of Allergan's business affairs.

20  Termeer is a resident of Massachusetts.

21     49.   The defendants named in ¶¶39-48 are sometimes referred to herein as the

22  "Individual Defendants" or "Defendants."

23     50.   By virtue of their positions as directors, and/or officers of Allergan and/or

24  their exercise of control and ownership over the business and corporate affairs of

25  Allergan, the Individual Defendants have, and at all relevant times had, the power to

26  control and influence and did control and influence and cause Allergan to engage in the

27  practices complained of herein. Each Individual Defendant owed and owes Allergan and

28  its shareholders fiduciary obligations and were and are required to: (1) use their ability to

13

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

control and manage Allergan in a fair, just and equitable manner; (2) act in furtherance of the best interests of Allergan and its shareholders; (3) act to maximize shareholder value in connection with any change in ownership and control to the extent consistent with governing statutes; (4) govern Allergan in such a manner as to heed the expressed views of its public shareholders; (5) refrain from abusing their positions of control; and (6) not favor their own interests at the expense of Allergan and its public shareholders.

51. Each defendant herein is sued individually and as an aider and abettor and in his capacity as a director of Allergan. The liability of each of the defendants arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## IV.   FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52. By reason of defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with plaintiff and the other public stockholders of Allergan and owe the Company, as well as plaintiff and the other members of the Class, a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure.

53. The claims asserted herein, except for Count II, are brought under Delaware state law which requires every corporate director to act in good faith, in the best interests of a corporation and its shareholders, and to act with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. In a situation where a bona fide offer is presented to a company that represents a substantial premium over the trading price of its stock, the applicable state law requires the directors to take all steps reasonably required to properly evaluate and respond accordingly to the offer. To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)   adversely affects the value provided to the corporation's shareholders;

(b)   contractually prohibits them from complying with or carrying out their fiduciary duties;

1        (c)     discourages or inhibits alternative offers to purchase the corporation or

2       its assets; or

3        (d)     will otherwise adversely affect their duty to search and secure the best

4       value reasonably available under the circumstances for the corporation's

5       shareholders.

6        54.     In accordance with their duties of loyalty and good faith, defendants, as

7 directors and/or officers of Allergan, are obligated to refrain from:

8        (a)     participating in any transaction where the directors' or officers' loyalties

9       are divided;

10       (b)     participating in any transaction where the directors or officers receive or

11       are entitled to receive a personal financial benefit not equally shared by the

12       public shareholders of the corporation;

13       (c)     unjustly enriching themselves at the expense or to the detriment of the

14       public shareholders, and/or

15       (d)     unjustly entrenching themselves as managers and/or officers of the

16       Company by failing to give adequate consideration to legitimate bids for the

17       Company.

18        55.     Plaintiff alleges herein that the Individual Defendants, separately and

19 together, in connection with the offer, violated the fiduciary duties owed to Allergan and

20 its public shareholders, including their duties of loyalty, good faith and independence,

21 insofar as they have failed to give proper and good faith consideration to the Valeant

22 bid, which represents a significant premium over the stock's trading price in the days,

23 weeks, and months prior to the offer, for the sole purpose of entrenching themselves in

24 the lucrative positions as managers of a large publicly traded corporation, and to obtain

25 for themselves personal benefits.

26        56.     Because the Individual Defendants have breached their duties of loyalty,

27 good faith and independence in connection with their failure to act in good faith to

28 consider the Valeant bid, and by using the poison pill to assist them in this improper

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1   entrenchment, the Individual Defendants, as a matter of Delaware law, have breached

2   their fiduciary duties of good faith and fair dealing owed to the shareholders of the

3   Company and to the Company itself.

4                            **V.   CLASS ACTION ALLEGATIONS**

5         57.   Plaintiff brings this action on her own behalf and as a class action pursuant

6   to F.R.C.P. 23 on behalf of all holders of Allergan stock who are being and will be

7   harmed by Defendants' actions described below (the "Class").  Excluded from the Class

8   are defendants herein and any person, firm, trust, corporation, or other entity related to or

9   affiliated with any defendant.

10        58.   This action is properly maintainable as a class action.

11        59.   The Class is so numerous that joinder of all members is impracticable.

12   According to Allergan's SEC filings, there were 297,556,619 shares of Allergan

13   common stock outstanding as of March 31, 2014.

14        60.   There are questions of law and fact which are common to the Class and

15   which predominate over questions affecting any individual Class member.  The common

16   questions include, *inter alia*, the following:

17        (a)   whether defendants have breached their fiduciary duties of undivided

18   loyalty, independence or due care with respect to plaintiff and the other members of the

19   Class as a result of their rejection and failure to consider in good faith the Valeant bid;

20        (b)   whether defendants are attempting to entrench themselves as managers and

21   officers of the Company in order to preserve their lucrative and prestigious positions at

22   the expense of maximizing shareholder value by failing to give adequate consideration to

23   the Valeant bid;

24        (c)   whether defendants have breached their fiduciary duty by using a poison

25   pill and unlawful bylaws to further entrench themselves as officers and/or directors of

26   the Company;

27

28

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

(d)     whether defendants are attempting to unjustly enrich themselves and other insiders or affiliates of Allergan as a result of their efforts to entrench themselves as managers and directors of the Company;

(e)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with their rejection and refusal to consider in good faith the Valeant proposal, including the duties of good faith, diligence, candor and fair dealing; and

(f)     whether defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage this or any other offers for the Company or its assets.

61.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

62.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

63.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

64.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

65.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## VI.   <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

66.     Plaintiff brings this action derivatively in the right and for the benefit of Allergan to redress injuries suffered and to be suffered by Allergan as a direct result of the breaches of fiduciary duty by defendants.  Allergan is named as a nominal party

1  solely in a derivative capacity.  A true and correct copy of this complaint was delivered

2  to the Company prior to filing.

3      67.    Plaintiff will adequately and fairly represent the interests of Allergan in

4  enforcing and prosecuting its rights.

5      68.    Plaintiff is an owner of Allergan stock and was an owner of Allergan stock

6  during all times relevant to the defendants' wrongful course of conduct as alleged herein.

7      69.    In bringing this action, plaintiff has satisfied all of the governing statutory

8  requirements of Delaware, Allergan's state of incorporation.  First, plaintiff has

9  demonstrated her standing to bring this action as a shareholder and/or beneficial owner

10  of Allergan common stock at the time the acts and omissions complained of herein

11  occurred, and she continues to hold Allergan common stock.  Second, plaintiff will fairly

12  and adequately represent the interests of the Company in enforcing the rights of the

13  Company, as detailed herein.  Third, this action is not being used by plaintiff to gain any

14  personal advantage, nor does plaintiff maintain any personal agenda other than seeking

15  to correct the wrongs that have been done to the Company.  To this end, plaintiff has

16  taken steps to file this action and has retained counsel experienced in derivative litigation

17  and corporate governance actions.

18      70.    Plaintiff is not required to make a demand on Allergan to bring this suit.

19  Instead, Delaware law allows Plaintiff to allege demand futility.  Making a demand on

20  the Allergan board to assert the claims alleged herein would be a wasteful and futile act.

21  At the time Plaintiff filed this action, Allergan's Board of Directors consisted of nine

22  directors, including Defendants Deborah Dunsire, Michael R. Gallagher, Trevor M.

23  Jones, Louis J. Lavigne, Jr., Peter J. McDonnell, Timothy D. Proctor, David E.I. Pyott,

24  Russell T. Ray, and Henri A. Termeer.  Because the Board consists of an odd number of

25  directors, Plaintiff need only allege that demand is futile as to five of the nine current

26  directors in order to establish demand futility.

27      71.    First, demand is futile as to a majority of the board because at least six of

28  the current directors are interested and therefore not independent.  On June 2, 2014,

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  Valeant and Pershing filed a Preliminary Proxy Statement with the SEC in which they

2  solicited support from Allergan shareholders to call a special meeting and indicated their

3  intent to submit for the vote of Allergan shareholders several proposals at the special

4  meeting (which we now know will be held on December 18, 2014).  One of those

5  proposals calls for the removal of six current Allergan directors, to be replaced by

6  directors proposed by Valeant and Pershing.  Thus, a majority of the current board is

7  interested because six such directors face the loss of their job and a significant tarnish to

8  their reputation should they be removed.  Being removed from their directorial positions

9  by majority shareholder vote would significantly damage the directors' professional

10  reputations and make it very difficult for them to obtain alternative seats on other boards

11  and other job opportunities.

12      72.     Valeant and Pershing subsequently clarified that the six current Allergan

13  directors which they will ask shareholders to remove on December 18, 2014 are:

14  Deborah Dunsire, Michael R. Gallagher, Trevor M. Jones, Louis J. Lavigne, Jr., Russell

15  T. Ray and Henri A. Termeer.

16      73.     The December 18, 2014 special meeting is in essence a referendum on the

17  stewardship of the current Allergan Board – the Individual Defendants named herein.

18  As a result, the Board as a whole is interested and any demand on them to authorize the

19  Company to pursue the claims alleged herein would be futile – doing so would not only

20  expose the Directors to personal liability but also would significantly increase the

21  likelihood that shareholders would vote in favor of the proposal to replace Defendants

22  Dunshire, Gallagher, Jones, Lavigne, Ray and Termeer.   Thus, a majority of the Board

23  is personally interested in the claims asserted herein and is incapable of considering a

24  demand to bring suit in a disinterested and independent manner.

25      74.     Moreover, Defendants Dunshire, Gallagher, Jones, Lavigne, Ray and

26  Termeer would lose a very large source of annual income if they lose their jobs as

27  directors of Allergan.  As alleged herein, almost every single incumbent director at

28

19

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  Allergan is currently paid in excess of $400,000 per year just for sitting on the board, as

2  demonstrated by the following chart from the Company's 2014 Proxy Statement:

3

| Director | Fees Earned or Paid in Cash(1) | Stock Awards/Units(2)(3) | Option Awards(3) | Other Compensation(4) | Total |
|---|---|---|---|---|---|
| Herbert W. Boyer, Ph.D.(5) | $  61,000 | $           0 | $           0 | $        897 | $  61,897 |
| Deborah Dunsire, M.D. | $  90,000 | $   176,116 | $122,790 | $     1,443 | $390,349 |
| Michael R. Gallagher | $ 121,500 | $   176,116 | $122,790 | $     3,949 | $424,355 |
| Dawn Hudson | $ 114,000 | $           0 | $245,603 | $           0 | $359,603 |
| Trevor M. Jones, Ph.D. | $  97,500 | $   352,232 | $           0 | $     1,289 | $451,021 |
| Louis J. Lavigne, Jr. | $  98,500 | $   352,232 | $           0 | $           0 | $450,732 |
| Peter J. McDonnell, M.D. | $  75,000 | $   352,232 | $           0 | $           0 | $427,232 |
| Timothy D. Proctor | $  77,000 | $   352,232 | $           0 | $           0 | $429,232 |
| Russell T. Ray | $ 121,500 | $   352,232 | $           0 | $           0 | $473,732 |
| Stephen J. Ryan, M.D.(5) | $  39,000 | $   352,232 | $           0 | $        214 | $391,446 |

9      75.    These fees are much higher than the director fees paid at many

10 publicly-traded companies.  Because they are personally interested in the matter, demand

11 is futile as to a majority of the Board.

12     76.    On November 3, 2014, the Individual Defendants caused Allergan to file a

13 Preliminary Proxy Statement with the SEC in which they opposed all the matters set

14 forth by Valeant/Pershing for the vote at the special meeting on December 18, 2014.  In

15 the Preliminary Proxy, Allergan stated:  "We strongly urge you to reject Pershing Square

16 and Valeant's efforts to replace the current, duly elected members of your Board, all of

17 whom have substantial relevant industry experience."  Thus, the Individual Defendants

18 are opposed to Valeant's special meeting proposals and are clearly interested in

19 Valeant's efforts to replace Dunshire, Gallagher, Jones, Lavigne, Ray and Termeer in

20 order to effectuate Valeant's takeover of Allergan. The Preliminary Proxy also makes it

21 clear that the Individual Defendants have caused Allergan to oppose all Valeant's

22 proposals:  "**The Allergan Board recommends a vote AGAINST all of Pershing**

23 **Square and Valeant's Proposals."**

24     77.    Defendant Pyott is also interested because he faces a substantial likelihood

25 of liability for the claims asserted herein, and for the counterclaims asserted by

26 Valeant/Pershing in the related case pending in this Court.  Pyott took active and

27 concerted steps to entrench himself in office and thwart Valeant's offer, including

28 personally participating in efforts to discredit Valeant and depress its stock price.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

78.     Pyott is also interested because he failed to fully inform himself regarding Valeant's offer.  Directors who fail to fully inform themselves about a material and substantial matter such as a 55% premium acquisition proposal are not entitled to the protection of the business judgment rule.  Thus, any demand is futile as to Pyott.

79.     Demand is also futile as to Pyott because the Company admits that Pyott is not independent in its SEC filings, including the Company's annual proxy statements. Pyott is an employee of Allergan and derives substantial annual income of approximately $10 million from Allergan.

80.     Defendant Gallagher is interested because he faces a substantial likelihood of liability for the claims asserted herein, and for the counterclaims asserted by Valeant/Pershing in the related case pending in this Court.  Gallagher took active and concerted steps to entrench himself in office and thwart Valeant's offer, including personally participating in efforts to discredit Valeant and depress its stock price. Gallagher admitted at his deposition taken on October 7, 2014 in the related action pending in this Court that he personally participated, approved and/or reviewed the myriad of press releases, articles, and other efforts by Allergan which are alleged to discredit Valeant and depress its stock price.

81.     Demand is also futile as to Gallagher because Gallagher failed to fully inform himself regarding Valeant's offer.  Directors who fail to fully inform themselves about a material and substantial matter such as a 55% premium acquisition proposal are not entitled to the protection of the business judgment rule.  Thus, any demand is futile as to Gallagher.

82.     Demand is also futile as to Gallagher because Gallagher is interested. Gallagher already received a no-confidence vote from Allergan's shareholders at the 2014 annual meeting, where over 33.4% of the Company's shareholders voted against re-electing Gallagher.  Despite the large percentage of shareholders opposed to Gallagher's continued stewardship, Allergan paid Gallagher $424,355 in 2013.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

83.     Demand is also futile as to Gallagher because Gallagher has acted in bad faith and in a disloyal manner, and breached his duty of candor to Allergan.  As alleged herein, Gallagher knowingly or recklessly caused Allergan to make false and misleading statements about Valeant's takeover proposal and caused Allergan to spend millions of dollars in a futile attempt to defend its unlawful bylaws which are harmful to shareholders and have the effect of entrenching the Individual Defendants in office. Breaches of the duty of candor and self-dealing constitute non-indemnifiable conduct. Thus, Gallagher faces a substantial likelihood of liability in this action and is therefore interested.

84.     Demand is also futile as to Gallagher because he completely failed to perform his duties as Lead Independent Director of Allergan.   The Individual Defendants, including Gallagher, have steadfastly refused to strip Pyott of his dual roles as Chairman and CEO despite shareholder proposals in each of the last two years which passed by over 50% vote in favor of separating such roles.  Instead of listening to the Company's shareholders, Gallagher and the rest of the Board have allowed Pyott, the CEO of the Company who is admittedly not independent by the Company's own admission, to also serve as the Chairman of the Board.  As a supposed counterweight to Pyott's lack of independence, the Board gave Gallagher a "title" of lead independent director.   But Gallagher has completely failed to do anything to check Pyott's self-dealing conduct and to prevent such conduct from harming Allergan and its shareholders.  Gallagher failed to prevent Pyott from traveling to Canada to attack Valeant, allowed Pyott to choose conflicted legal and financial advisors to represent Allergan in its response to Valeant's offer, and affirmatively voted in favor of adopting the restrictive poison pill and unlawful bylaws.  Thus, any demand as to Gallagher is clearly futile.

85.     Demand is futile as to Directors Deborah Dunsire, Trevor M. Jones, Louis J. Lavigne, Jr., Peter J. McDonnell, Timothy D. Proctor, Russell T. Ray, and Henri A. Termeer because they have breached their duty of candor, acted in bad faith and have

1  engaged in self-dealing.  Breaches of the duty of candor, bad faith conduct, and self-

2  dealing constitute non-indemnifiable conduct which expose the directors to personal

3  liability.   First, Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray and Termeer

4  completely failed to fully inform themselves of all material facts regarding Valeant's

5  offer.   A director who fails to fully inform himself or herself is not entitled to the

6  protection of the business judgment rule.  Further, such directors actually disregarded the

7  advice of the Company's own investment banker, Goldman Sachs, who advised them to

8  inform themselves about Valeant's offer and acquire more information.  The directors'

9  bad faith conduct in the face of Goldman Sachs' advice demonstrates that the directors'

10 wrongdoing was intentional and/or reckless, not merely negligent.  Rejecting Goldman

11 Sachs' advice, Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray and Termeer adopted a

12 "just say no" defense, spearheaded by the least independent member of the Board – Pyott

13 – and immediately adopted a restrictive poison pill.  They thereafter refused to meet with

14 Valeant, sign a confidentiality agreement with Valeant, or consider in good faith the

15 Valeant offer.

16      86.   Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray and Termeer are also

17 interested because they failed to perform the most important and basic function of a

18 director in the face of an unsolicited takeover proposal – hiring independent financial

19 and legal advisors.   Instead, the directors allowed the Company's interests to be

20 represented by legal and financial advisors that are loyal to Pyott and themselves.

21      87.   Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray and Termeer also

22 breached their duty of candor by allowing Allergan, Pyott, and others to issue false and

23 misleading statements about Valeant's takeover proposal and caused Allergan to spend

24 millions of dollars in a futile attempt to defend its unlawful bylaws which are harmful to

25 shareholders and have the effect of entrenching the Individual Defendants in office.

26 Breaches of the duty of candor and self-dealing constitute non-indemnifiable conduct.

27 Thus, Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray and Termeer face a substantial

28 likelihood of liability in this action and are therefore interested.

23

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

88.     Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray, Termeer, and Gallagher also breached their duty of candor because they caused Allergan to make false and misleading statements about the reasons for the resignation of Allergan's CFO, Jeff Edwards.   As alleged more particularly herein, Allergan did not provide a full description of the reasons for Edwards' resignation, which was announced in a hasty and unexpected fashion just one month after he had been required to make a second upward adjustment of Allergan's earnings guidance.  The circumstantial evidence which exists suggests that the proffered explanation for Edwards' resignation – to "spend more time with his family" – was pretextual and untrue.  Dunsire, Jones, Lavigne, McDonnell, Proctor, Ray, Termeer, and Gallagher breached their duty of candor by allowing Allergan to make untrue or misleading statements about the reasons for Edwards' resignation.

## VII.   SUBSTANTIVE ALLEGATIONS

89.     Allergan is a global, technology-driven multi-specialty health care company.    Allergan's flagship franchises in eye care, neurosciences, medical dermatology and urologics are structured under the company's pharmaceutical business portfolio, Allergan Pharmaceuticals.  This portfolio offers specialty physicians and their patients a wide range of treatments to help preserve and protect sight, reduce physical disability and enhance quality of life.

90.     With the acquisition of Inamed Corporation in 2006, Allergan added breast aesthetics and dermal fillers to its business portfolio to create a world-leading medical aesthetics franchise. All of these products are now represented within the Allergan Medical corporate division.

91.     As demonstrated below, over the last two years, shareholders have voted on provisions that would have made it easier to call special meetings to address fundamental governance issues, but Allergan and the Individual Defendants have taken actions to thwart such efforts.

92.     Allergan and its Board have also steadfastly refused to separate the roles of

24

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

Chairman and CEO.  Both such roles are currently held by Defendant Pyott.  Allergan did appoint a "Lead Independent Director" but such person – Defendant Gallagher – has been ineffectual in countering the conflict of interest posed by Defendant Pyott concurrently holding the dual roles of Chairman and CEO.

93.     Beginning in February 2014, the irreconcilable conflicts of interest posed by Allergan's Board manifested themselves in ways that caused and continue to cause substantial damages to Allergan and its shareholders.  In the face of a very substantial premium takeover offer from Valeant Pharmaceuticals International and Pershing Square, the Individual Defendants have entrenched themselves in office, adopted a restrictive poison pill provision, refused to even talk to Valeant, and wasted millions of dollars of Allergan's money on scorched-earth litigation in both California and Delaware.

A.     **Allergan's Shareholders Vote in Favor of a Special Meeting Right, But Allergan's Board Adopts Bylaw Amendments to Undercut that Right**

94.     At Allergan's 2012 Annual Meeting, Allergan shareholders proposed a resolution that would have allowed holders of 10% of Allergan's shares to call a special meeting. Allergan's Board recommended that shareholders vote against the proposal, advising shareholders in the Company's March 15, 2012 Schedule 14A that "[a] special meeting … should generally occur only when either fiduciary obligations or strategic concerns require that matters be addressed expeditiously." Despite the Board's "no" recommendation, 55.3% of Allergan's shareholders voted in favor of the resolution.

95.     In 2013, facing increased shareholder pressure for a special meeting right, Allergan's Board proposed an amendment to Allergan's Certificate of Incorporation, but increased the required number of shareholders to call the meeting from 10% to 25% of the Company's outstanding common stock. At the April 30, 2013 Annual Meeting, shareholders almost unanimously approved the amendment, with more than 99% of shares voting in favor.

96.     The Individual Defendants, however, promptly took action to undermine the amendment to Allergan's Certificate of Incorporation by adopting the Special Meeting Bylaw, which attempts to alter and contradict certain provisions of the Certificate, which no bylaw is permitted to do.  In addition, the Bylaw creates substantive conditions to the right granted in the Certificate that are not set forth in the Certificate and find no precedent or support in the Certificate. Finally, the Bylaw attempts to create procedural hurdles to the submission of requests that materially impair the ability of the shareholders to exercise the right granted in the Certificate and are not necessary to the operation of the rights granted in the Certificate.

97.     As a result, the Special Meeting Bylaw improperly varies the terms of the Certificate, adds terms and conditions to the right granted in the Certificate that are not in the Certificate, and operates in a manner that fundamentally undermines the right granted in the Certificate. These onerous, technical, and highly complicated requirements in the Special Meeting Bylaw would, if enforced in the manner threatened by Allergan, make it impossible, as a practical matter, for shareholders to call a special meeting. In addition to the Allergan shareholders (owning in aggregate 31% of Allergan's outstanding common stock) who have submitted special meeting requests, many other Allergan shareholders would have joined the special meeting request if not for the onerous and unlawful terms of the Special Meeting Bylaw.

98.     Allergan's Bylaws are based on a form used by its long-time outside counsel Latham & Watkins LLP.  Notably, while Latham's standard form bylaws are extremely unfriendly to shareholders and impinge on the special meeting right, Allergan's Board approved a modified set of bylaws that dramatically exacerbate the flaws in the Latham model. For example, as explained below (and as has been pointed out by ISS and Glass Lewis & Co.), Allergan's Special Meeting Bylaw imposes extensive informational disclosure requirements on *all* shareholders who submit special meeting requests, not solely the lead shareholder who is spearheading the meeting and

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

soliciting proxies in connection therewith. By contrast, the Latham model only imposes these disclosure requirements on the lead shareholder.

99.     At the time the shareholders approved the Certificate of Incorporation amendment, the Individual Defendants concealed from Allergan's shareholders that the proposed Special  Meeting Bylaw contained provisions that—if fully enforced— would contradict the Certificate provision, create conditions and qualifications to the rights set forth in the Certificate that were not set forth in the Certificate and for which there was no basis or precedent in the Certificate, and qualify the special meeting right out of existence. While the Company attached a copy of the proposed set of Bylaw amendments to the March 8, 2013 Proxy, Allergan did not seek shareholder approval of any bylaw amendment. The Company's explanation of the potential Bylaw amendments was a misleading summary that did not disclose the extent to which the bylaw amendment fundamentally altered the right granted in the Certificate and downplayed the magnitude of the changes as a set of "procedural and informational requirements," which included the requirement that the "requesting stockholder's notice must provide certain information regarding the business proposed to be conducted, and as to the stockholder giving notice and any person or entity acting in concert with the stockholder giving notice."

**B.     The Special Meeting Bylaw Is Inconsistent With the Certificate of Incorporation.**

100.   The right of Allergan shareholders to call a special meeting of the shareholders is set out in Allergan's Certificate of Incorporation in a single sentence. *See* Allergan's Bylaws, Art. 10. By contrast, the Special Meeting Bylaw is set forth in five single-spaced pages of Allergan's Bylaws. *See* Allergan's Bylaws, Art. II, § 3. The language of the Special Meeting Bylaws also incorporates numerous additional requirements from other sections in the Certificate and Bylaws.

101.   The language of the Special Meeting Bylaw contradicts the express terms of the Certificate of Incorporation in certain significant respects. For example:

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1          a.     Allergan's Certificate of Incorporation requires a special meeting upon receipt of requests by "the holders of record of at least twenty-five percent (25%) of the outstanding shares of common stock of the Corporation." In contrast, the Special Meeting Bylaw states that a special meeting may only be called if the Proposing Persons "have a Net Long Beneficial Ownership (as defined below) of at least the Requisite Percentage" and only if those Proposing Persons (including every solicited shareholder and its associates) provide detailed information about themselves. "Net Long Beneficial Ownership" is defined as something more than record ownership of over 25% of the outstanding shares. Specifically, "Net Long Beneficial Ownership" is defined as "those shares of common stock of the Corporation as to which the stockholder or Proposing Person, as applicable, possesses (i) the sole power to vote or direct the voting, (ii) the sole economic incidents of ownership (including the sole right to profits and sole risk of loss), and (iii) the sole power to dispose of or direct the disposition."

b.     Allergan's Certificate of Incorporation provides that a special meeting "shall be called … upon the written request of holders of record." However, the Special Meeting Bylaw requires that the requests be submitted by, and information be provided about, defined "Proposing Persons" that include numerous persons in addition to the record holder, such as "any participant (as defined in paragraphs (a) (ii)-(vi) of Instruction 3 to Item 4 of [SEC] Schedule 14A) with such stockholder in such solicitation," "any … associate (within the meaning of Rule 12b-2 under the Securities Exchange Act of 1934 …) of such stockholder or beneficial owner," and "any other person with whom such stockholder or such beneficial owner (or any of their respective associates or other participants in such solicitation) is Acting in Concert." A person is defined as "Acting in Concert" if such person "knowingly acts (whether or not pursuant to an express agreement, arrangement or understanding) in concert or in parallel with, or towards a common goal with such other person, relating to changing or influencing the control of the corporation or in connection with or as a participant in any transaction having that purpose or effect," subject to certain further conditions and exceptions. The

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

term "Associate" under SEC Rule 12b-2 is a very broad term and includes, among other things, any entity in which the "person is an officer or partner or is, directly or indirectly, the beneficial owner of 10 percent or more of any class of equity securities," any "trust or other estate" as to which the person is a trustee or similar fiduciary or substantial beneficiary, and the spouse and certain other relatives of the person.

c.      Allergan's Certificate of Incorporation requires that determination of whether the requisite percentage of stock has requested a meeting be made "at the time such request is validly submitted by the holders of such requisite percentage of such outstanding stock." In contrast, the Special Meeting Bylaw undermines this provision by stating that a Proposing Person's sale of Allergan shares following the delivery of special meeting requests (as well as the loan of shares to third parties) constitutes an automatic proportional revocation of such requests.

d.      Allergan's Certificate of Incorporation mandates that the special meeting be held if the necessary requests are submitted. The Certificate of Incorporation does not give the Allergan Board any discretion to delay or not call the meeting, or to require continuously updated shareholder submissions in order to validate the special meeting. Nonetheless, the Special Meeting Bylaw adopted by the Individual Defendants provides that the Board may refuse to call the special meeting even if all necessary conditions have been satisfied.  The Special Meeting Bylaw also allows the Board to cancel a validly called special meeting if the requesting shareholders fail to comply with the requirement that they supply updated information through the date of the meeting.

e.      Allergan's Certificate of Incorporation provides for the right to call a special meeting to "holders of record of at least twenty-five percent (25%) of the outstanding shares of common stock of the Corporation." In contrast, the Special Meeting Bylaw limits the class of shareholders who are eligible to call a special meeting. For example, the Special Meeting Bylaw invalidates the request of any shareholder that does not affirmatively represent that the requesting shareholder intends to hold Allergan stock through the date of the special meeting.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

f.     Allergan's Certificate of Incorporation mandates that the meeting "shall be called by the Secretary upon the written request" of the requisite number of shareholders. In stark contrast, the Special Meeting Bylaw inconsistently states in Article II Section 3(B)(1) that the "Secretary shall not accept, and shall consider ineffective," special meeting requests that comply with the Certificate if, for example, (i) the Special Meeting Request is received by the Corporation during the period commencing ninety (90) days prior to the first anniversary of the date of the immediately preceding annual meeting, (ii) the Board calls an annual or special meeting of shareholders (in lieu of calling the Shareholder Requested Special Meeting) "in accordance with section (B)(3) of this Section 3," (iii) a Similar Item is already included in the Corporation's notice as an item of business to be brought before a meeting of the shareholders that has been called but not yet held, or (iv) such Special Meeting Request was made in a manner that involved a violation of Regulation 14A under the Exchange Act, or other applicable law. These unlawful conditions significantly reduce the amount of time between annual meetings when shareholders can exercise their right to call a special meeting.

**C.    The Special Meeting Bylaw Adds New Conditions to the Certificate Rights That Are Not Contained in the Certificate of Incorporation.**

102.   The Special Meeting Bylaw passed by the Individual Defendants also manufactures improper conditions to the rights granted in the Certificate that are not contained in the Certificate of Incorporation and find no precedent or support in the Certificate, such as:

a.     Allergan's Certificate of Incorporation does not impose any time limits for submission of requests to call a special meeting. In stark contrast, the Special Meeting Bylaw states that requests will not be honored if received within 90 days of the anniversary of the last annual meeting.

b.     Allergan's Certificate of Incorporation does not require that any purpose be stated by the shareholder requesting a special meeting – the Special Meeting

30

Bylaw, in contrast, mandates that each special meeting request identify an identical purpose and matter to be acted upon at the special meeting.

        c.    While the Special Meeting Bylaw requires each Proposing Person (including Associates) to make exhaustive disclosures, Allergan's Certificate of Incorporation does not require <u>any</u> disclosures.

        d.    Allergan's Certificate of Incorporation does not impose any limitation on the reasons for which a special meeting may be called.  The Special Meeting Bylaw, in contrast, states that requests will not be honored if "a substantially similar item (a 'Similar Item') to that included in the Special Meeting Request was presented at any meeting of stockholders held within one year prior to the receipt by the Corporation of the Special Meeting Request."

        e.    Allergan's Certificate of Incorporation does not allow a proper request for a special meeting to be voided for any reason.  The Special Meeting Bylaw, in contrast, allows the Individual Defendants to unilaterally void a request if "such Special Meeting Request was made in a manner that involved a violation of Regulation 14A under the Exchange Act."

### D.    The Special Meeting Bylaw Contains Burdensome Disclosure Requirements.

103.    Allergan's Special Meeting Bylaw also imposes burdensome disclosure requirements on shareholders submitting special meeting requests. Rather than imposing a disclosure obligation on merely the lead proposing shareholder (as is the case in the Latham & Watkins model on which the Special Meeting Bylaw was based), the Special Meeting Bylaw requires every person who submits a special meeting request to disclose significant information about itself.

104.    Under the Special Meeting Bylaw, the definition of "Proposing Person" is not limited to the Allergan shareholders seeking the meeting. Instead, the universe of "Proposing Persons" obligated to provide disclosure information extends to numerous third parties having no interest in or relevance to the matter. Indeed, the Special Meeting

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

Bylaw requires disclosures from any submitting shareholder's "Associates," which is broadly defined to include (i) any entity in which the shareholder directly or indirectly beneficially owns 10% or more of any class of any equity security; (ii) any entity in which the shareholder is an officer or limited or general partner; (iii) any trust in which the shareholder is a trustee or similar fiduciary or has a substantial beneficial ownership interest; and (iv) any relative of the shareholder who shares the same home as the beneficial owner. (Ex. A, Art. 2, § 3(A)(5)(a).)

105.   Under the Special Meeting Bylaw's expansive definition of "Proposing Person," each Proposing Person must disclose:

- The Proposing Person's Allergan holdings or other interests (*id.*, Art. 2, §§ 3(A)(5)(d), 3(A)(5)(d)(i)-(ii));

- Disclosures from *every* Proposing Person that are required under the federal proxy rules from a person publicly soliciting proxies under Regulation 14a, including, for example, the Proposing Person's trading history in Allergan shares (*id.*, Art. 2, § 3(A)(5)(d)(vi) (incorporating Item 5(b)(1)(vi) of Rule 14a-101));

- "Such other information and representations as would be required by Article 12 of the [Certificate] and Section 9 of Article II of [the] Bylaws" (*id.*, Art. 2, § 3(A)(4));

- "Any material pending or threatened action, suit or proceeding … in which such Proposing Person is, or is reasonably expected to be made, a party or material participant involving the Corporation or any of its officers, directors or employees" (*id.*, Art. 2, § 3(A)(5)(d)(iii));

- "Any direct or indirect material interest in any material contract or agreement of such Proposing Person with the Corporation, any affiliate of the Corporation or any principal competitor of the Corporation" (*id.*, Art. 2, § 3(A)(5)(d)(v)); and

- "Any other material relationship between such Proposing Person … and the Corporation, any affiliate of the Corporation, any officer, director or employee of

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

the Corporation or any affiliate thereof, or any principal competitor of the Corporation" (*id.*, Art. 2, § 3(A)(5)(d)(iv)).

106.   These burdensome requirements require expansive disclosure of information that is irrelevant to Allergan's evaluation of a special meeting request, but which may be highly sensitive to shareholders and their "associates." For example, the Special Meeting Bylaw requires a Proposing Person to disclose sensitive details about family members, or any non-profit for which the Proposing Person sits on the board, or interests or investments in (undefined) "competitors" of Allergan.

### E.   Defendants Refuse to Consider in Good Faith Offers from Valeant, Refuse to Inform Themselves Concerning Offers from Valeant, and Take Steps to Entrench Themselves

107.   The Individual Defendants have breached their fiduciary duties to Allergan and its shareholders by failing to fully inform themselves of all material information regarding Valeant's offers and instead adopting a "just say no" defense, regardless of the costs or consequences to Allergan and its shareholders.

108.   According to a preliminary proxy statement filed by Valeant, on January 14, 2014, William F. Doyle, a senior advisor at Pershing Square, spoke with J. Michael Pearson, Valeant's Chairman and CEO, at a health care conference. They discussed Doyle's work with Pershing Square and it was suggested that they have a subsequent discussion regarding the potential of Valeant and Pershing Square jointly engaging in merger and acquisition transactions. On January 31, 2014, Pearson and Doyle had a follow-up meeting in which they exchanged public information about Valeant and Pershing Square.  Doyle and Pearson did not specifically discuss Allergan at either meeting.

109.   On February 4, 2014, Pearson and G. Mason Morfit, then a director of Valeant, met with Doyle and William A. Ackman, the Chief Executive Officer of Pershing Square. They primarily discussed Valeant and Valeant's business model. They also discussed what Pershing Square could do to encourage large public pharmaceutical companies to create more value for their stockholders, including by entering into

33

1  different types of transactions with Valeant, though the structure that Valeant eventually

2  used in connection with its offer for Allergan was not specifically discussed. Allergan

3  was one of several companies mentioned, but was not discussed in detail.

4      110.   On or around February 6, 2014, Ackman and Pearson had a telephone call

5  in which they discussed how they might work together to pursue targets in the

6  pharmaceutical industry. Conceptually, they discussed a potential structure in which

7  Valeant would identify a target and disclose it confidentially to Pershing Square, after

8  which Pershing Square could decide whether it was interested in working with Valeant

9  with respect to such target and, if it was not, Pershing Square would agree not to make

10  purchases of securities in such target. No specific targets were discussed on the

11  telephone call. If Pershing Square were to decide that it was interested in working with

12  Valeant with respect to a particular target identified by Valeant at a later date, then

13  Pershing Square would conduct independent due diligence on the target, confirm its

14  interest in working with Valeant to pursue a potential combination of Valeant and the

15  target, and proceed to develop a strategy to purchase equity in the target. Around the

16  same time, Pearson and Pyott agreed to meet the following weekend to follow up on

17  their September 2012 discussions regarding the possibility of combining the two

18  companies.

19      111.   On February 7, 2014, Valeant's Finance and Transactions Committee held a

20  telephonic meeting at which they discussed a possible combination of Valeant and

21  Allergan.

22      112.   On February 9, 2014, Valeant and Pershing Square entered into a

23  confidentiality agreement, after which, Pearson called Ackman by telephone and

24  informed him of Valeant's interest in a potential transaction with Allergan. Later that

25  day, the Valeant Board met telephonically and discussed, among other things, the

26  recently executed confidentiality agreement with Pershing Square, the disclosure to

27  Ackman by Pearson of Valeant's interest in a potential transaction with Allergan and

28  pursuing an acquisition of Allergan with Pershing Square.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

113.   On February 11, 2014, Pershing Square formed a new Delaware limited liability company, PS Fund 1, and Pershing Square, L.P., Pershing Square II, L.P., Pershing Square International, Ltd. and Pershing Square Holdings, Ltd. (the "Pershing Square Funds"), which are investment funds managed by Pershing Square, entered into the original limited liability company agreement for PS Fund 1.

114.   On February 13, 2014, representatives of Valeant and Pershing Square met to discuss a potential transaction involving Allergan. Representatives of Sullivan & Cromwell and Kirkland & Ellis also attended.  Later that day, Sullivan & Cromwell sent Kirkland & Ellis a draft of an amended confidentiality agreement.  Between February 13, 2014 and February 20, 2014, representatives of Sullivan & Cromwell and Kirkland & Ellis exchanged drafts of and negotiated the amended confidentiality agreement. Over that time, the parties negotiated to expand the categories of information covered by the confidentiality agreement to include confidential information about Valeant in connection with Pershing Square's due diligence investigation on Valeant.

115.   On February 16, 2014, the Valeant Board held a telephonic meeting and discussed, among other things, pursuing an acquisition of Allergan and doing so with Pershing Square through a co-bidder entity. The Valeant Board discussed the potential role that Pershing Square could play in facilitating a business combination transaction with Allergan and the potential timeline of such a transaction if Valeant were to determine to pursue a proposal for an acquisition of Allergan. On February 19, 2014, Morfit and members of the audit and risk committee of the Valeant Board and members of Valeant's senior management met telephonically with representatives of Sullivan & Cromwell and Osler to discuss the structure of a potential acquisition of Allergan.

116.   On February 20, 2014, Valeant and Pershing Square entered into the amended confidentiality agreement, dated as of February 9, 2014. That same day, Kirkland & Ellis sent Sullivan & Cromwell a draft letter agreement related to the purchase of equity in Allergan. Between February 20, 2014 and February 25, 2014, representatives of Valeant, Pershing Square and their respective counsel exchanged

drafts of and negotiated the letter agreement. Over that time, the parties negotiated the terms and conditions upon which PS Fund 1 would purchase Allergan equity securities, including the $75.9 million limit on the number of shares of Allergan common stock that could be purchased for Valeant's account and the manner in which such shares and profit and loss would be allocated to Valeant; the timing of Valeant's contribution to PS Fund 1 upon notice from Pershing Square that PS Fund 1 had crossed the 4% ownership level; the flexibility that Valeant would retain through the addition of Valeant's right to approve purchases in excess of 5%; the extent to which Valeant would consult with Pershing Square regarding a potential acquisition of Allergan; the terms and conditions upon which Valeant could elect to cause Pershing Square to purchase $400 million of Valeant common shares immediately prior to the consummation of an acquisition of Allergan; the value of the Valeant common shares that Pershing Square would hold following consummation and the related holding period; and the events upon which PS Fund 1 would be dissolved.

117.   On February 25, 2014, Valeant and Pershing Square entered into the Pershing Square relationship letter, pursuant to which they agreed that a joint venture entity (which they decided would be PS Fund 1) would acquire shares of Allergan common stock and derivative instruments referencing Allergan common stock. Later that day, PS Fund 1 began acquiring securities of Allergan.

118.   On April 8, 2014, PS Fund 1 reached ownership of 4.9% of Allergan's outstanding stock and stopped purchasing equity in Allergan. On April 10, 2014, Valeant provided approval for PS Fund 1 to purchase equity interests in Allergan that would result in PS Fund 1 owning more than 5% of Allergan's outstanding stock. Between April 11 and April 21, 2014, PS Fund 1 acquired 14.0 million Allergan American-style call options and Allergan forward purchase contracts representing an additional 4.7% of Allergan's outstanding shares of common stock. As of April 21, 2014, PS Fund 1 held various American-style call options to purchase 24,831,107 shares of Allergan common stock, with strike prices ranging from $1.20 to $1.33 and exercisable through dates

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

ranging from March 4, 2015 to April 20, 2015, and had entered into certain forward purchase contracts with a forward price of $140.37 and an expiration date of April 22, 2015, covering 3,450,000 shares of Allergan common stock.

119.   On April 21, 2014, after the market closed, Pershing Square and Valeant each filed Schedule 13Ds with respect to their beneficial ownership of Allergan equity. The Schedule 13D filings disclosed that Pershing Square had beneficially acquired for the account of PS Fund 1 an aggregate of 28,878,538 shares of Allergan common stock for total consideration of $3,217,819,947, which had been contributed by the Pershing Square Funds and by Valeant Pharmaceuticals International pursuant to the Pershing Square relationship letter. That evening, Allergan issued a press release acknowledging the Schedule 13D filings by Valeant and Pershing Square.

120.   On April 22, 2014, Valeant delivered a public proposal to Defendants to acquire all outstanding shares of Allergan for a per-share price of $48.30 in cash and 0.83 shares of Valeant stock, representing a nominal value of $160.69 per share as of April 22, 2014.

121.   Hours later, the Allergan Board adopted a Rights Agreement or so-called "poison pill" (the defined term "Rights Plan").

122.   The Rights Plan is triggered if any shareholder becomes the "Beneficial Owner" of ten percent (10%) or more of Allergan stock.

123.   The Individual Defendants have broad authority to redeem the rights or amend the Rights Plan to exempt premium offers.  But the Individual Defendants have not done so and do not intend to do so.

124.   Allergan told shareholders that the purpose of the Rights Plan was "to provide the Board with adequate time to fully assess any proposal."  But the Board refused to fairly consider the Valeant offer, rejecting it without discussing the offer or negotiating with Valeant.

125.   On April 23, 2014, Ackman emailed Matthew Maletta, Allergan's Associate General Counsel and Secretary, to request an opportunity to speak with Michael R.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  Gallagher, the lead independent director of the Allergan Board, and Pearson spoke
2  briefly with Pyott by telephone.

3    126.   Maletta arranged a telephone call between Ackman and Gallagher, but later
4  noted that Pyott and Jim Hindman, SVP of Investor Relations for Allergan, would be
5  joining Gallagher on the call. While Ackman welcomed the opportunity to have a
6  discussion with Pyott on April 24, 2014, Ackman's purpose for the call was to speak
7  with Gallagher, without management present, as the lead director who Ackman
8  expected, based on Allergan's proxy disclosures, to be the Allergan Board's independent
9  representative for Allergan stockholders in considering the Valeant proposal.

10    127.   During the April 24, 2014 call, Ackman requested the opportunity to speak
11  with Gallagher in executive session, which Gallagher rejected.  Ackman then asked for
12  Gallagher's contact information so Ackman could contact Gallagher directly in the
13  future.  Gallagher was unwilling to provide Ackman with his contact information
14  because Gallagher explained that he did not believe it was appropriate to speak to
15  Ackman alone.  Ackman then offered to speak with Gallagher with the Allergan Board's
16  counsel present on the call, and Gallagher also refused this request.

17    128.   On May 12, 2014, Pyott sent a letter to Pearson, stating that the Allergan
18  Board had rejected Valeant's proposal.  Allergan's Board refused to meet with Valeant
19  prior to rejecting its offer.

20    129.   In May of 2014, Valeant twice revised and improved its cash and stock
21  offer to represent a 55% premium to Allergan's unaffected stock price (*i.e.*, prior to the
22  Valeant deal). The market reacted favorably to each offer, but the Individual Defendants
23  refused to even meet with Valeant, and made no attempt to obtain full and complete
24  information about Valeant's offer.

25    130.   On June 2, 2014, Valeant announced that it intended to launch an exchange
26  offer for the purpose of acquiring all outstanding Allergan shares.  On June 18, 2014,
27  Valeant filed a Schedule TO and Form S-4 with the SEC to formally commence the
28

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

exchange offer ("Exchange Offer").[6]

131.   Valeant Pharmaceuticals International, Inc., AGMS, and PS Fund 1, LLC are identified as co-bidders in the Exchange Offer.  As described in the Form S-4, Pershing Square agreed to exchange all the Allergan shares it controls for Valeant stock as opposed to cash, immediately after consummation of the offer.  The Offer was originally set to expire on August 15, 2014, but was subsequently extended to December 31, 2014.

132.   The Exchange Offer is conditioned on, among other things, the Allergan board redeeming the poison pill rights plan dated as of April 22, 2014, or the poison pill rights otherwise being rendered inapplicable.

133.   On June 10, 2014, the Individual Defendants rejected Valeant's revised offer without speaking to Valeant and without conducting any due diligence on Valeant's business. In an interview that same day with *The Wall Street Journal*, Defendant Pyott admitted that the Allergan Directors were uninformed about the value of the revised offer's stock component, telling the *Journal* "[t]he only part [of the revised offer] we do know how to value is the U.S. dollar portion."

134.   Valeant has made multiple premium offers to merge with Allergan, but the Individual Defendants have refused to talk with Valeant and rejected these offers. Publicly, the Individual Defendants have attacked Valeant and raised criticism of Valeant's business model, its business practices, and its senior management. Behind the scenes, the Individual Defendants have lobbied investors and other interested parties to disregard Valeant's offers.

135.   Significantly, the Individual Defendants deliberately decided to avoid requesting any opinion from Allergan's financial advisors on whether the Valeant

---

[6] June 18, 2014 Valeant Schedule TO, *available at* http://www.sec.gov/Archives/ edgar/data/850693/000119312514203378/d745611 disctot.htm; June 18, 2014 Valeant Form S-4 *available at* http://www.sec.gov/Archives/edgar/data /885590/ 000119312514240177/d742263ds4.htm.

39

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  proposal is fair to Allergan's shareholders.  Attempting to cover up their decision not to

2  obtain a fairness opinion, the Individual Defendants caused Allergan to obtain a so-

3  called "inadequacy" opinion, with full knowledge that the proposed transaction was fair

4  to shareholders.

5  136.   An "inadequacy opinion" can be provided by a financial adviser in

6  circumstances where the price offered is within the range of fairness, but there is a

7  possibility that an acquirer might be able to pay a higher price than that which has been

8  offered – even $0.01 per share may be enough.

9  137.   In contrast, a fairness opinion is addressed to whether the financial

10  consideration offered to Allergan's shareholders is within a range of fairness from the

11  perspective of various financial methodologies – most typically a discounted cash flow

12  analysis, comparable companies analysis, and precedent transaction analysis.

13  138.   The Individual Defendants are well aware that their fiduciary duties require

14  them to obtain a fairness opinion in order to meaningfully assess Valeant's offer.  Instead

15  of doing so, the Individual Defendants chose to obtain "inadequacy opinions" in an

16  effort to provide cover for their entrenchment tactics and self-dealing.

17  139.   On June 23, 2014, the Individual Defendants caused Allergan to file with

18  the Securities and Exchange Commission a response to Valeant's exchange offer, in

19  which it stated that Valeant's offer was "grossly inadequate" to holders of Allergan

20  Shares, "substantially undervalues Allergan, creates significant risks and uncertainties

21  for Allergan Stockholders, and is not in the best interests of Allergan and its

22  stockholders."  Accordingly, Allergan recommended to its shareholders: "REJECT the

23  offer and NOT TENDER your Shares pursuant to the Offer" (emphasis in original).[7]

24  140.   Allergan's Schedule 14D-9 cites no fairness opinion, only the opinions of

25  its financial advisors, Goldman Sachs & Co. ("Goldman Sachs") and Merrill Lynch,

26  Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), that the offer was merely inadequate, in

27  ──────────────

28  [7] June 23, 2014 Allergan Schedule 14D-9 at 22, *available at* http://www.sec.gov/
Archives/edgar/data/850693/000119312514244537/d746340dsc14d9.htm.

1    that negotiation with Valeant (which Allergan flatly refuses to do) might improve the

2    price offered by Valeant.[8]   Allergan retained Goldman Sachs and Merrill Lynch to

3    provide financial opinions, and on June 21, 2014, Goldman Sachs and Merrill Lynch

4    "rendered an oral opinion to the Board, subsequently confirmed in writing, to the effect

5    that, as of June 21, 2014 … the Offer was inadequate from a financial point of view to

6    such holders [of Allergan shares]" (emphasis added).[9]

7        141.   The written opinions of Goldman Sachs and Merrill Lynch expressly state

8    that they are limited to assessing the "adequacy" of the Valeant offer from a financial

9    point of view.  As Goldman Sach's opinion states: "We do not express any view on, and

10   our opinion does not address, the fairness, from a financial point of view, of the

11   Consideration or any other term or aspect of the Transactions."[10]   Merrill Lynch's

12   opinion likewise states: "no opinion or view is expressed with respect to the fairness

13   (financial or otherwise) of the Consideration to be paid in the Transaction or amount,

14   nature or any other aspect of any compensation … to be paid in the Offer."   Yet,

15   Allergan has intentionally cited these reports as supporting its clams that the price

16   offered by Valeant represented "grossly inadequate" value for Allergan stockholders.

17   The reports do not support these statements and instead only opine that the price is

18   "inadequate" inasmuch as "further" negotiations with Valeant might result in an

19   increased price.

20       142.   The Individual Defendants know or have recklessly disregarded the fact that

21   there is no basis for the statement that the Valeant proposal (at a 50% premium) is

22   "grossly inadequate."   Indeed, on February 13, 2014, a research report issued by

23   Allergan's own advisor, Bank of America Merrill Lynch, set a price target of $132 for

24   Allergan's stock, far below Valeant's offer.

25

26   _____

27   [8] *Id.* at 22.
     [9] *Id.* at 18-19.

28   [10] *Id.* at Annex B.

---

41

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

143.   The Schedule 14D-9 filing also claims that the offer "substantially undervalues" Allergan, but contains no financial analysis supporting that assertion. (*Id.* at 9, 19, 26).   That is contrary to SEC Release No. 34-16833 (May 23, 1980), which requires that valuation claims in contested solicitations be made "in good faith and on a reasonable basis" and be accompanied by disclosure that facilitates the shareholder's understanding of the basis for, and the limitations on, the projected realizable values. Allergan provided no such disclosure.

### F.   Two Allergan High-Level Executives Resign Amid The Individual Defendants' Wrongful Conduct

144.   At the same time they were trying to depress Valeant's share price by attacking Valeant and meeting with Valeant's shareholders, the Individual Defendants pressured Allergan management to attempt to artificially inflate the Company's share price with questionable earnings guidance.

145.   In February 2014, before Valeant made its offer, Allergan issued earnings guidance to the stock market which predicted earnings growth between 12% and 15% for fiscal year 2014. On May 12, 2014, Allergan suddenly changed its guidance and told analysts that Allergan "can achieve EPS growth of 20% on a compound annual basis over the next five years."   Allergan then increased its guidance again July 14, 2014. Analysts have observed that there do not appear to have been any changes in Allergan's business during this period that would account for such a material change in Allergan's earnings guidance.

146.   The absence of any fundamental changes in Allergan's business suggests that the Individual Defendants told management to increase Allergan's earnings guidance as part of defendants' efforts to thwart Valeant's offer at any cost.   Increased earnings guidance makes Allergan look more valuable and thus makes Valeant's offer look less valuable.   The person at Allergan in charge of earnings guidance was, at the time, Jeff Edwards, the Company's CFO.   Edwards enjoyed this prestigious position and was well-paid for his services, having earned $2,961,943 in 2013.

147.   Suspiciously, Allergan announced Edward's unexpected resignation on August 18, 2014, right in the middle of the year and right in the middle of Valeant's acquisition offer.   Allergan initially provided very few details about Edward's resignation, and then later offered as an explanation that Edwards "wanted to spend more time with his family."   Edwards was at the peak of his career and earning almost $3 million a year – not a typical formula for someone wanting to resign.   Moreover, if Edwards truly did want to resign to "spend more time with his family," then one would think that he would have announced his resignation at the end of the year and provided more notice so that Allergan could ensure a smooth transition.   The discernible facts cast doubt on the proffered reason for Edwards' resignation and suggest instead that Edwards resigned because he was pressured to increase Allergan's earnings guidance twice in two months and that Edwards did not believe the increased earnings guidance was warranted or achievable.   Edwards resigned unexpectedly just one month after the second increase in earnings guidance in July 2014.[11]

148.   On Monday, November 3, 2014, Allergan announced that David Lawrence, Allergan's head of corporate development, had left Allergan the previous week after notifying the Company of his decision in early September 2014.   The heads of corporate development are normally charged with managing M&A situations.

149.   In announcing Lawrence's resignation on November 3, 2014, Allergan stated:  "David Lawrence made the decision to retire from Allergan in the beginning of September to commit more time to his health and family," an Allergan spokesman said.

---

[11] Once Edwards was gone, the Company's earnings forecasts continued to be raised.  On October 27, 2014, Allergan increased guidance again, announcing that it expects earnings per share for 2014 to be in the range of $6.27 to $6.30, raised from its earlier estimate of $6.20 to $6.25.  Annual product sales were forecast to between $7.1 billion and $7.2 billion.  Defendant Pyott issued a press release to announce the increased guidance, stating "we are making excellent progress on the stockholder value enhancements announced in July...which are resulting in enhanced...earnings per share growth and thus increased stockholder value."

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  "David was an important member of our leadership team, and we support him as he
2  focuses solely on his personal priorities and commitments."

3     150.   Lawrence's departure was announced in the middle of the bitter takeover
4  battle between Allergan and Valeant, which exposed rifts between some of Allergan's
5  executives, according to emails which were made public in September 2014 as part of
6  the briefing on Allergan's motion for preliminary injunction before Judge David Carter
7  of this Court.  It also follows the departure of Jeff Edwards, Allergan's former chief
8  financial officer who left the company in August. At the time, Allergan said Edwards
9  was stepping down due to family commitments.

10    151.   In emails made public in September 2014, Lawrence had suggested that
11 Allergan take a softer approach in its public comments about Valeant's stock and
12 business model.

13    152.   In one email, Lawrence urged Pyott to tone down the attacks. He called
14 such criticisms, backed by unnamed "industry experts," a "high-risk proposition" that
15 could backfire if Valeant challenged their assertions. "I don't think [it] gets us much and
16 if [Valeant] can refute the claims we make…we could shoot ourselves in the foot and
17 lose credibility," he wrote on July 11, 2014.

18    153.   Pyott wrote back that he disagreed, and that the industry sources Allergan
19 relied on were credible.  He also chastised Lawrence for waiting until the last minute to
20 raise concerns, according to the emails.

21    154.   Later that day, Lawrence emailed Edwards and expressed frustration that he
22 had been left out of discussions surrounding the Valeant bid, saying he had been
23 "paddled" by Pyott for speaking up. He added that he was thinking of leaving the
24 company if offered a package that would allow his stock options and awards to vest.
25 Lawrence is reported to have notified Allergan executives of his decision about two
26 months later.

27

28

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

### G.     The Individual Defendants Attempt to Thwart the Special Meeting Called by Allergan's Shareholders

155.   Because the Individual Defendants would not even talk to Valeant, Pershing Square and Valeant launched a proxy contest.  On May 13, 2014, Pershing Square filed preliminary proxy materials with the SEC on Schedule 14A soliciting revocable proxies from the Company's shareholders to vote at a meeting of the Company's shareholders on a non-binding resolution urging the Board to promptly engage in good faith discussions with Valeant regarding its proposed merger.

156.   After Valeant filed its Schedule 14A, the Individual Defendants caused Allergan to contact the SEC and tell it that the shareholder referendum was not regulated by the SEC proxy rules.  The Individual Defendants did so in order to attempt to thwart the right of Allergan's shareholders to call a special meeting: if Pershing Square could not solicit and obtain non-binding votes from other shareholders via the SEC's proxy rules, it risked triggering the poison pill based upon the definition of beneficial ownership under the Rights Plan, since Pershing Square might be deemed to have "agreements, arrangements or understandings" not exempted from the scope of the Rights Plan's definition of ownership.

157.   On June 2, 2014, PS Fund 1 began the process of calling a special meeting by filing a preliminary solicitation statement on Schedule 14A (the "Preliminary Proxy") to solicit the necessary commitments from 25% of Allergan's outstanding shares. PS Fund 1 sought to call a special meeting for the purpose of, among other things, (1) removing six of the nine members of the Allergan Board; (2) recommending a slate of independent replacement directors; (3) removing the burdensome disclosure and other requirements the Bylaws impose on shareholders calling a special meeting; and (4) requesting that Allergan's Board promptly engage in good faith discussions with Valeant.

158.   Thus, the special meeting that Pershing Square sought was effectively a referendum on the Individual Defendants' conduct.  If Allergan's shareholders agree

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1   with the Board that the Valeant proposal should be rejected, then they can vote against

2   removing directors and against engaging in good faith discussions with Valeant.  If

3   Allergan's shareholders believe that the Board should consider the offer – which offers

4   them a substantial premium over the pre-announcement stock price of Allergan – and

5   negotiate with Valeant, then they can vote for requesting that the board enter in to

6   discussions and to remove six of the board members who have chosen, as Glass Lewis

7   put it, "obstructive" behavior "[m]ore indicative of a board concerned with entrenching

8   its position than seeking to enhance shareholder value."

9       159.  The Individual Defendants immediately took steps to thwart Pershing

10   Square's attempt to call a special meeting by creating uncertainty about whether efforts

11   to obtain the required 25% shareholder threshold for calling a special meeting might

12   trigger the 10% Beneficial Owner threshold in the poison pill. If that were the case, the

13   special meeting could not be called because shareholders would not be able to satisfy the

14   purported requirements of the Bylaws without triggering the poison pill.

15       160.   After the Individual Defendants refused to alleviate shareholder concern by

16   adequately explaining Allergan's position, PS Fund 1 filed a declaratory judgment action

17   in Delaware Chancery Court on June 12, 2014, seeking clarification that assisting and

18   coordinating with shareholders regarding the submission of special meeting requests

19   would not trigger the Rights Plan. After Chancellor Bouchard granted PS Fund 1's

20   motion for expedition, Allergan ultimately was forced to agree to a stipulated order that

21   allowed PS Fund 1's efforts to call a special meeting to proceed.

22       161.   On June 16, 2014, the Individual Defendants caused Allergan to file a

23   Preliminary Revocation Solicitation Statement on Schedule 14A with the SEC for the

24   purpose of actively soliciting shareholders *not* to submit special meeting requests and to

25   revoke any special meeting requests already submitted.  Allergan took the position that

26   its revocation campaign would continue through the date of the special meeting itself,

27   during which time Allergan would seek to obtain revocations of shareholders' special

28   meeting requests, which purportedly would allow the Board to cancel the meeting

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

altogether if the revocations were successful in causing the support level to fall below the requisite 25% of outstanding shares.

**H.  Prior to the Time That the Individual Defendants Were Forced by Valeant's Delaware Litigation to Allow Valeant to Call a Special Meeting of Allergan's Shareholders, Shareholder Advisory Firms ISS and Glass Lewis Decried Allergan's Special Meeting Bylaw As Onerous, Unnecessary, and Contrary to Shareholder Rights**

162.   Prior to the time that Valeant's lawsuit in Delaware forced the Individual Defendants to allow Valeant to call a special meeting, prominent shareholder advisory firms ISS and Glass Lewis voiced objections to the Special Meeting Bylaw and Allergan's stated reasons for the applicability of that Bylaw, thus demonstrating that the Individual Defendants' conduct constitutes a breach of fiduciary duty, entrenchment, and self-dealing.

163.   On August 4, 2014, Glass Lewis released a report advising Allergan shareholders to provide their consent to Pershing Square's call for a special meeting. That report criticized Allergan's Special Meeting Bylaw:

- "The written request process is highly unique and involves many technical steps of shareholders if they determine to participate." (*Id.* at 1.)

- The Bylaws "are both disproportionately time consuming and dense." (*Id.* at 7.)

- The Bylaws "operate more as a strong deterrent to those investors contemplating a special meeting requisition not otherwise supported by the board." (*Id.* at 7.)

164.   Glass Lewis concluded its report by noting:

All other things equal, we believe Allergan's bylaws leave its board in a position of leverage when considering a shareholder-supported special meeting request. The challenges attendant to this cumbersome process are readily evident as an extension of the options made available to shareholders – investors electing to participate in Pershing Square's

47

1  Written Request process must satisfy a myriad of significant and ongoing
2  administrative hurdles, while the board can, and will, contemporaneously
3  seek to nullify these efforts through a decidedly simpler proxy solicitation
4  process to be conducted up until the date of the prospective special
5  meeting. ***In our opinion, this procedural dichotomy casts a rather
6  dubious light on the seriousness of the board's desire to be responsive to
7  investors.***
8  *Id.* at 6 (emphasis added).

9      165.   On August 6, 2014, ISS issued a report which similarly recommended that
10  Allergan shareholders vote in favor of Pershing Square's call for a special meeting. The
11  report noted that "there appear to be significant governance issues which could be
12  addressed through the proposed special meeting."  ISS criticized Allergan's Special
13  Meeting Bylaw for imposing "***unusual and unnecessary constraints on the right to call
14  special meetings***." For example, ISS noted the folly of the Bylaw's disclosure
15  requirements:  "Because ['Proposing Person'] is so broadly defined, moreover—in a
16  world of institutional investors with hundreds of billions in assets and countless
17  individual investors, beneficiaries, managed accounts, etc.—it quickly daisy chains into
18  a vast web of 'associates' for whom the institutional shareholder trying to comply with
19  the information request has no information rights to begin with." (*Id.* at 10.)  ISS noted
20  that shareholders found these constraints to be a burden on the ability to exercise their
21  right to call a special meeting which is guaranteed in Allergan's Certificate of
22  Incorporation: "In calls with investors considering whether to support the request for
23  special meeting, ISS heard repeatedly that the additional procedural and information
24  requirements laid out by the Allergan bylaws imposed a significant burden, and the
25  opportunity to eliminate them at this special meeting was increasingly becoming a
26  meaningful reason to persist  in calling the special meeting." *Id.* at 9.

27      166.   ISS also noted that it did not find credible Allergan's defense of its Special
28  Meeting Bylaw as an attempt to "strike a balance between corporate democracy and the

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

risk these rights might be misused." ISS's report stated:

> Asked once again, in summary, to reconcile how the extensive bylaw constraints the board had placed on the right to call special meetings was an appropriate response to a shareholder mandate, rather than an attempt to frustrate shareholders' exercise of their governance rights, the lead independent director offered that the board had been informed by its advisors that such bylaw constraints were common at other companies. Asked to provide the names of ten such companies, the company responded several days later with a fresh seven-page memo from its external counsel listing twenty companies with at least one similar provision in their bylaws [and further rationale]. [An ISS review of the memo showed that] ***the Allergan bylaws are far more restrictive than any of the comparator companies the board apparently reviewed, with no discernable advantage for Allergan shareholders***.

(*Id.* at 8 (emphasis added).) ISS concluded that "there is little credible reason to believe the Allergan board has in any meaningful way struck an appropriate balance between the ability of shareholders to exercise their governance rights and the risk some shareholder might somehow abuse those rights." *Id.* at 10.

### I.   Rebuked by the Delaware Court in Their Efforts to Block a Special Meeting, the Individual Defendants Continue to Take Actions to Prevent a Special Meeting Which Has the Potential to Recall Them From Office

167.   Forced by Valeant's lawsuit in Delaware to hold a special meeting on December 18, 2014, the Individual Defendants have pursued and continue to pursue many plans to avoid getting thrown out of office on December 18, 2014.  First, the Individual Defendants have caused Allergan to spend millions of dollars litigating a lawsuit in this Court which seeks a preliminary injunction barring Valeant and Pershing from voting their shares at the December 18, 2014 special meeting.

168.   Second, the Individual Defendants have, as noted above, caused Allergan to

49

disparage Valeant in an effort to drive its stock down.  Those efforts caused David Lawrence, the head of Allergan's M&A department, to resign after Defendant Pyott excoriated Lawrence for questioning whether Allergan's attacks on Valeant were supportable and in the best interests of Allergan's shareholders.  Pyott also thereafter excluded Lawrence from further discussions of the Valeant offer.

169.   Third, the Individual Defendants have caused Allergan to pursue multiple strategies which are not in the best interests of Allergan shareholder and whose sole purpose is to attempt to block the Valeant offer and entrench the Individual Defendants in office.

170.   In recent months, Pyott stated that (1) Allergan was considering potential stock repurchases and that Allergan could leverage up to make a $10 billion acquisition with "no sweat"; (2) he had met with Allergan investors to discuss increasing Allergan's defenses to Valeant's Exchange Offer by leveraging up to buy back $10 billion of Allergan stock or issue a special dividend; and (3) Allergan has more than $14 billion in free cash flow to fund the defensive transactions the Individual Defendants are exploring.

171.   Defendant Pyott has been unable to conceal that the purpose of executing an alternative transaction is to moot the special meeting. On Allergan's July 21, 2014 earnings call for the second quarter of 2014 (the "July 21, 2014 Earnings Call"), Pyott advised the stock market that Allergan was considering alternative transactions, and that "whatever we need to do can be done before a special meeting is held." Pyott's comments betrayed the Individual Defendants' intention, upon Allergan's determination that it had received a valid special meeting request, to refuse to call a special meeting and, instead, to schedule a board-sponsored meeting up to 120 days or more after the submission by shareholders of sufficient requests to call the special meeting. This maneuver would have the effect of precluding any special meeting and postponing any other meeting so that the Board will have more time to consummate an alternative transaction.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

172.   In explaining how the Individual Defendants would analyze potential alternative transactions, Defendant Pyott distinguished between the standard that would be applied to an "all-cash deal," which would not require shareholder approval, and a transaction requiring shareholder approval—noting that a transaction requiring shareholder approval would have to be "very compelling" in light of the Valeant proposal. The fact that, in Pyott's mind, an "all-cash deal" would not have to be "very compelling," reveals Defendants' self-dealing conduct and disregard for the best interests of Allergan's shareholders.

173.   Recent developments have illuminated the Individual Defendants' scheme to find a friendly white knight which would save their jobs and help them thwart Valeant's offer.  On August 19, 2014, the *Wall Street Journal* reported that Allergan had approached Salix Pharmaceuticals Ltd.—whose $10 billion market cap is approximately 33% of Allergan's unaffected size—and at least one other company about entering into a strategic transaction.  The practical effect of the Individual Defendants' efforts to execute an alternate transaction while leaving the poison pill in place is to coerce shareholders into a board-sponsored alternative transaction before shareholders have an opportunity to express support for Valeant's Exchange Offer, let alone accept it.

174.   Significantly, the stock market does not seem to believe that Allergan can deliver a better deal for shareholders by attempting to grow earnings organically, and instead that only a strategic acquisition can attempt to match the premium being offered by Valeant.

175.   For example, on November 3, 2014, the Individual Defendants filed a Preliminary Proxy on November 3, 2014 urging Allergan shareholders to vote against the proposals set forth by Valeant for a vote at the special meeting on December 18, 2014.  In this preliminary proxy, Allergan stated that it had been approached by a third party about a strategic acquisition.  The preliminary proxy stated:

In addition, we have been approached by another party regarding a potential transaction. We cannot provide assurance on the outcome of

1   these contacts regarding transactions we have not announced and
2   because our Board has determined that premature disclosure with respect
3   to the possible terms of any transaction might jeopardize continuation of
4   any discussions or negotiations, our Board has instructed management
5   not to disclose the possible terms of any such transactions or proposals,
6   or the parties thereto, unless and until an agreement in principle relating
7   thereto has been reached or, upon the advice of counsel, as may
8   otherwise be required by law.

9   176.   Analysts on Wall Street were skeptical of Allergan's statements about the
10   mysterious "third party" and said that "who that bidder might be is probably not much of
11   a secret, as Actavis (ACT) has been frequently mooted as a possible acquirer."  *See*
12   BARRON'S, "Allergan:  Enter the Mysterious 'Alternate' Bidder," Nov. 3, 2014.

13   177.   On November 3, 2014, Citigroup analysts Liav Abraham and Timothy Li
14   also surmised that Actavis is likely the mysterious alternative bidder alluded to by
15   Allergan, and stated their skepticism that Allergan could grow earnings internally in
16   such a way as to deliver the same value to Allergan's shareholders as that offered by the
17   Valeant offer or another similar takeover proposal:

18   "We are unsurprised by Allergan's confirmation in its proxy materials
19   released earlier today that the company has been approached by an
20   alternate bidder. Notwithstanding Allergan's robust growth profile and
21   attractive fundamentals, we continue to view Allergan's stand-alone
22   strategic alternatives, including the potential deployment of capital prior
23   to the December 18 Special Meeting, as limited at this point in time, and
24   see a potential acquisition by an alternate bidder as the most feasible
25   means of preventing a hostile takeover by Valeant."

26   178.   Ironically, in opposing the proposals set forth for a vote by Valeant at the
27   December 18, 2014 special meeting, the Individual Defendants filed a Preliminary Proxy
28   on November 3, 2014 urging Allergan shareholders to vote against the Valeant slate of

52

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

directors under the rationale that Valeant's proposed directors might not be capable of objectively considering the best interests of Allergan's shareholders. The Preliminary Proxy stated:

> "We believe there is no need for Pershing Square and Valeant's nominees to be added to our Board, as each of our current directors has more relevant experience than each of Pershing Square and Valeant's nominees and is independent from Pershing Square and Valeant. While Pershing Square and Valeant's nominees may not be controlled by Valeant or obligated to vote as directed by Valeant, we believe Pershing Square and Valeant's nominees' views about the conditional Exchange Offer could be colored by their relationship with Pershing Square and Valeant.
>
> Furthermore, as the Allergan Board continues to evaluate the best ways to create value for stockholders, we believe that Pershing Square and Valeant's nominees might not be able to make such evaluations without bias because their objectivity may have been compromised as described above. As business strategies and transactions are evaluated in the future, we believe it would be in the best interests of our stockholders for directors not associated in any way with Valeant to be entrusted with the task of comparing the conditional Exchange Offer with other options. Pursuant to our Bylaws, to the extent our directors are removed from our Board, vacancies can be filled solely by the affirmative vote of a majority of our remaining directors then in office, even if less than a quorum."

**J.     The Individual Defendants Cause Allergan to File a Lawsuit in California to Delay the Special Meeting.**

179.   On August 1, 2014, the Individual Defendants caused Allergan to file the

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

California Lawsuit[12] in this Court, alleging that Valeant, Pershing Square, PS Fund 1, and William A. Ackman of Pershing Square have violated certain provisions of the securities laws governing tender offers, including Regulation 14A under the Securities Exchange Act of 1934.

180.   The Individual Defendants have caused Allergan to make statements which suggest that one of the purposes of filing the California Lawsuit was to use the allegations in that case to refuse or delay a special meeting regardless of the number of requests received or the purposes for which a special meeting was sought. Immediately upon filing the California Lawsuit, the Individual Defendants caused Allergan to write to the Delaware Chancellor that "the violations of the Exchange Act alleged in Allergan's federal action may be relevant to the Allergan board's consideration of any Special Meeting request." According to Allergan, the Special Meeting Bylaw requires that a proper special meeting request comply with the Exchange Act, and its pending California Lawsuit casts that into doubt. Such arguments did not carry the day and, as indicated herein, Chancellor Bouchard described Allergan's onerous bylaws as "horse chokers" and Allergan was forced to stipulate to holding its special meeting on December 18, 2014 and to not do anything to interfere with the meeting occurring on such date.

181.   Before being rebuked in Delaware, the Individual Defendants even attempted to use the pendency of the California Lawsuit to preclude Chancellor Bouchard's review of Allergan's bylaws by claiming that the Delaware Court of Chancery lacked jurisdiction to review the requests' compliance with the Special Meeting Bylaw, and that the bylaw's validity under Delaware law could not be

---

[12] *Allergan, Inc. et al. v. Valeant Pharmaceuticals International, Inc. et al.*, Case No. SACV 14-1214-DOC(ANx) (C.D. Cal.)

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1  considered until this Court resolved Allergan's claims under the Exchange Act.[13]

2  ## VIII.  **DEFENDANT PARSCHAUER'S WRONGDOING**

3  182.   Defendant Karah Parschauer is, and has been at all relevant times, Vice

4  President and Assistant General Counsel at Allergan, Inc.  As an officer and employee of

5  Allergan, Parschauer owed fiduciary duties of good faith, care, and loyalty to Allergan.

6  Parschauer also owed a duty of honest services to her employer, Allergan.

7  183.   Defendant Parschauer is a lawyer admitted to practice in California and has

8  specialized knowledge of corporate law (including bylaws and articles of incorporation),

9  proxy rules, the fiduciary duties owed by directors and officers of a publicly-traded

10  corporation, and other laws relevant to the claims asserted in this lawsuit.  Indeed, prior

11  to joining Allergan, Parschauer worked as a lawyer at Latham & Watkins LLP,

12  Allergan's main outside law firm and its counsel in the complaint which both Allergan

13  and Parschauer filed in this court as plaintiffs, in which they are suing Valeant, Pershing,

14  and other defendants.

15  184.   As alleged herein, Latham & Watkins has historically pitched its corporate

16  clients on adopting restrictive bylaws which can inhibit the ability of shareholders to

17  effect change at the corporations and restrict shareholders' ability to exercise their voting

18  rights.  But when Latham & Watkins worked with Allergan on the bylaws that are

19  implicated in this lawsuit, Parschauer worked with her former colleagues at Latham &

20  Watkins to make the bylaws much more draconian and unfair, to the point that the

21  bylaws actually became unlawful, as the Delaware court later determined.  Parschauer

22  worked with Latham to draft and approve the relevant bylaws as part of her normal job

23  duties as Vice President and Assistant General Counsel at Allergan.  She did so

24  notwithstanding the fact that she knew the bylaws were unlawful and that her actions and

25  those of Allergan's directors in proposing and advocating the bylaws constituted a

---

26
27  [13] Allergan told the Delaware Chancellor that this Court had "exclusive jurisdiction" to
rule on "the Exchange Act issues," and only once it did so could the Allergan Board
28  ("subject to the Delaware court's oversight") evaluate the special meeting requests.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1    breach of fiduciary duty.

2      185.   In drafting the bylaws and advocating for their adoption, Parschauer

3 breached her fiduciary duties of care, loyalty, and good faith since she knew the bylaws

4 were unlawful, unenforceable, and would subject the company to lawsuits challenging

5 their enforcement and validity.   Parschauer breached her duty of loyalty because she

6 agreed to work with the defendants named herein in their unlawful course of conduct

7 aimed at entrenching themselves in office and disenfranchising Allergan's shareholders.

8      186.   Parschauer went so far as to agree to be a named plaintiff, along with

9 Allergan, in the lawsuit pending in this court, filed against Valeant and Pershing, which

10 suit would stall any challenge to the unlawful bylaws and thus thwart the effort of

11 Allergan shareholders to challenge defendants' wrongdoing.  Indeed, Parschauer joined

12 the lawsuit in order to attempt to establish standing for the federal proxy Rule 14e-3

13 insider trading claims because she knew that Allergan lacked standing to assert such

14 claims based on binding Ninth Circuit precedent, which established that Allergan lacked

15 standing because it was not a contemporaneous trader.  Parschauer acted in bad faith and

16 with an intentional or reckless disregard of the fact that her actions were unlawful and

17 constituted a breach of her fiduciary duties as an officer of Allergan, and that her actions

18 constituted a breach of her duty of honest services to her employer Allergan.  Parschauer

19 knew or recklessly disregarded the fact that even if she, as opposed to Allergan, had

20 standing to assert insider trading claims against Valeant and Pershing under federal Rule

21 14e-3, neither she nor Allergan had standing to seek injunctive relief for any alleged

22 violation since Parschauer could be made whole for any alleged damage to her individual

23 interests through an award of monetary damages.  Intentionally disregarding such facts,

24 Parschauer filed the lawsuit as a plaintiff and sought injunctive relief in the form of an

25 injunction barring Valeant and Pershing from voting their Allergan stock in favor of

26 proposals which are to be submitted at the December 2014 special meeting of Allergan's

27 shareholders, including those proposals which seek to throw out six of Allergan's nine

28 current directors and replace them with new directors.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

187.   Parschauer's wrongful conduct has damaged Allergan by causing it to incur millions of dollars in legal fees.  Allergan's reputation has also been irreparably harmed and damaged.  As alleged herein, reputable and well-respected shareholder advisory firms ISS and Glass Lewis & Co. have denounced Allergan's adoption and defense of the relevant bylaws as contrary to shareholders' interests.

188.   In engaging in the wrongdoing alleged herein, Parschauer both directly breached her own fiduciary duties and aided and abetted the breaches of fiduciary duties committed by the other defendants.

## IX.   CAUSES OF ACTION

### COUNT I

### BREACH OF FIDUCIARY DUTIES

**(DIRECT CLAIM ON BEHALF OF PLAINTIFF AND THE CLASS AND AGAINST ALL INDIVIDUAL DEFENDANTS)**

189.   Plaintiff repeats and realleges each allegation set forth herein.

190.   Defendants have violated fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of Allergan and have acted to put their personal interests ahead of the interests of Allergan shareholders.

191.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, have violated their fiduciary duties by disenfranchising Allergan's public shareholders, and by failing to give adequate consideration to the Valeant bid for Allergan without regard to the fairness of the transaction to Allergan shareholders, or the significant premium that this offer represents to the public shareholders of the Company.

192.   As demonstrated by the allegations above, defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Allergan because, among other reasons:

(a)   they failed to properly and adequately consider the premium bid by Valeant/Pershing, or take other necessary steps to maximize

57

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1          the value of Allergan to its public shareholders;

2      (b)    they failed to properly maximize the value of Allergan common

3          shares;

4      (c)    they have taken action to impede a shareholder vote on the

5          Valeant/Pershing offer and have taken action to prevent a special

6          meeting of the shareholders in an intentional effort to

7          disenfranchise Allergan shareholders; and

8      (d)    they ignored or did not protect against the numerous conflicts

9          of interest resulting from the directors' own interrelationships

10        in connection with their refusal to consider this bona fide and

11        legitimate premium offer.

12     193.  Because the Individual Defendants dominate and control the business and

13 corporate affairs of Allergan, and are in possession of private corporate information

14 concerning Allergan's assets (including the knowledge of any other undisclosed bids for

15 the Company), business and future prospects, there exists an imbalance and disparity of

16 knowledge and economic power between them and the public shareholders of Allergan

17 which makes it inherently unfair for them to reject any proposed transaction for the sole

18 purpose of entrenching themselves as managers and directors of the Company, to the

19 exclusion of maximizing stockholder value.

20     194.  By reason of the foregoing acts, practices and course of conduct, the

21 defendants have failed to exercise ordinary care and diligence in the exercise of their

22 fiduciary obligations toward plaintiff and the other members of the Class.

23     195.  As a result of defendants' actions, plaintiff and the Class have been and will

24 be harmed.

25     196.  Defendants are engaging in self dealing, are not acting in good faith toward

26 plaintiff and the other members of the Class, and have breached and are breaching their

27 fiduciary duties to the members of the Class.

28

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

## COUNT II

## BREACH OF DUTY OF HONEST SERVICES

### (DERIVATIVE CLAIM ON BEHALF OF ALLERGAN AND AGAINST DEFENDANTS PYOTT AND PARSCHAUER)

197. Plaintiff repeats and realleges each allegation set forth herein.

198. This claim is brought derivatively on behalf of the Company against Defendants Pyott and Parschauer for breach of their undivided duty of loyalty to their employer, Allergan.

199. Pyott and Parschauer were and are employees of Allergan.

200. As alleged above, Pyott and Parschauer breached their duty of loyalty to Allergan by not acting solely in Allergan's interests in performing their employment duties.

201. Those breaches of duty consisted of the conduct alleged throughout this complaint including, without limitation, Defendants' causing the Company to adopt and defend unlawful bylaws, engaging in conduct that subjected the Company to a lawsuit in Delaware that was resolved against the Company, filing a lawsuit in this Court that was filed for an improper purpose, entrenching themselves in office, and engaging in the other wrongful conduct alleged herein that damaged and harmed Allergan. Pyott and Parschauer benefitted from their wrongdoing, to the detriment of Allergan.

202. Allergan was harmed by these Defendants' breaches of their undivided duty of loyalty.

203. By reason of the foregoing, Allergan was harmed and will continue to suffer harm as described in greater detail above.

## COUNT III

## BREACH OF FIDUCIARY DUTIES

### (DERIVATIVE CLAIM ON BEHALF OF ALLERGAN AND AGAINST ALL INDIVIDUAL DEFENDANTS)

204. Plaintiff repeats and realleges each allegation set forth herein.

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

205.   Defendants owed and owe Allergan fiduciary obligations.  By reason of their fiduciary relationships, defendants owed and owe Allergan the highest obligation of good faith, fair dealing, loyalty and due care.

206.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision owed to the Company.

207.   As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Allergan has been and will be harmed.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment and preliminary and permanent declaratory and injunctive relief, in her favor and in favor of the Company and Class and against defendants as follows:

A.    Declaring that, as to the First Cause of Action, this action is properly maintainable as a class action;

B.    Declaring and decreeing that defendants' conduct has been in breach of the fiduciary duties owed by the Individual Defendants to Allergan and its public stockholders;

C.    Issuing a preliminary injunction declaring and decreeing that defendants' refusal to consider and respond in good faith to the offers to acquire Allergan is in breach of the fiduciary duties owed by defendants to Allergan and its shareholders and ordering defendants to comply with said fiduciary duties;

D.    Issuing a preliminary injunction directing the defendants to refrain from advancing their own interests at the expense of Allergan or its shareholders and exercise their fiduciary duties to act reasonably and respond in good faith to offers which are in the best interests of Allergan and its shareholders;

E.    Prohibiting defendants from entering into any contractual provisions which harm Allergan or its shareholders or prohibit defendants from maximizing shareholder

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

value, including any confidentiality agreement or contract designed to impede the maximization of shareholder value;

      F.    Invalidating the poison pill and/or directing defendants to rescind or redeem it and restraining defendants from adopting, implementing or instituting any defensive measures that have or are intended to have the effect of making the consummation of an offer to purchase the Company more difficult or costly for a potential acquiror;

      G.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

      H.    Granting such other and further relief as this Court may deem just and proper.

## XI.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  November 12, 2014        Respectfully submitted,

                      COTCHETT, PITRE & MCCARTHY LLP
                      Joseph W. Cotchett (SBN 36324)
                      Mark C. Molumphy (SBN 168009)
                      Nancy L. Fineman (SBN 124870)

                      ___s/ Joseph W. Cotchett___
                      Joseph W. Cotchett

                      San Francisco Airport Office Center
                      840 Malcolm Road, Suite 200
                      Burlingame, CA 94010
                      Telephone: (650) 697-6000
                      Facsimile: (650) 697-0577
                      jcotchett@cpmlegal.com
                      mmolumphy@cpmlegal.com
                      nfineman@cpmlegal.com

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

_____s/ Francis A. Bottini, Jr._____
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:   (858) 914-2001
Facsimile:     (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

*Counsel for Plaintiff Mary Tolaro*

SHAREHOLDER DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

**VERIFICATION**

I, Mary Tolaro, verify that I am a shareholder of Allergan, Inc. (the "Company"). I have reviewed the allegations made in this Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Dated:   November 04, 2014.

_____
MARY TOLARO